## Case No. 7,739.

### KETCHUM v. PACIFIC R. CO. et al.

[4 Dill. 78; [1] 3 Cent. Law J. 704.]

Circuit Court, E. D. Missouri. Sept., 1876.

STATUTABLE LIEN—EQUITABLE CHARGES—PLEDGE OF EARNINGS.

1. In 1864, while the state of Missouri was in full possession of the revenue of the defendant's road upon certain express trusts, which, it was provided, were to continue until the state bonds loaned to the company were paid or exchanged, by an act of January 7, 1865, the county of St. Louis was empowered to loan said company its bonds, which was done and accepted by the company. Section 2 of said act authorized the person who had theretofore been in custody of the earnings of the road for the state (called the fund commissioner), to pay into the county treasury, out of said earnings, a sum sufficient to meet the interest on said bonds loaned by said county as it accrued: Held, that by said act the state waived its lien and right to all the earnings of the company to the extent of the sum required to pay the interest on said bonds, and that the county was pro tanto substituted as to that amount in place of the state, with a lien or charge to that extent as effectual as the state before possessed.

2. As between the company and the county, the effect of the acceptance of the act, and the issue of the bonds by the county under it, was to convert the provisions of the second section into a contract, by which the company consented that the fund commissioner, or his successor, should, out of the earnings of the railroad, pay the sum necessary to meet the interest on said bonds, until they were paid by the company. This created a lien, statutable in its origin and equitable in its nature, on those earnings as they arise, which may be enforced by the county, so long as the bonds which it loaned to the company remain unpaid.

3. If a debtor, by a concluded agreement with a creditor, sets apart a specific amount of a specific fund in the hands, or to come into the hands, of another, from a designated source, and directs such person to pay it to the creditor, which he assents to do, this is a specific appropriation, binding upon the parties, and upon all persons with notice, who subsequently claim an interest in the fund under the debtor.

4. The mortgagees under a mortgage made subsequent to the acts of 1865 and 1868, authorizing the lien or charge, with notice of the fact that the county had made the loan, and that it was unpaid, are charged with notice of all the acts contain.

Petition by the county of St. Louis to establish a lien or charge on the fund in court. A general demurrer to the petition was submitted.

Mr. Bowman, Mr. Garesche, and Mr. Glover, for the county.

Mr. Broadhead, Mr. Litton, and Mr. Baker, for mortgagees.

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge. Under the authority of the act of January 7, 1865, the county of St. Louis issued and loaned to the Pacific Railroad its twenty-years seven per cent bonds to the amount of $700,000. The railroad company agreed to pay the interest on the said bonds as it fell due, and at maturity to pay the principal. The principal is not yet due, but until the recent embarrassment of the company, it has regularly paid to the county the amount required to meet the interest on the bonds. In 1868 the company made a first mortgage of its property and franchises to trustees, to secure a loan of $7,000,000, and in 1871 executed a second mortgage, to secure a further loan of $3,000,000. Subsequently, in 1875, it made a third mortgage, which is the one herein sought to be foreclosed, and in respect of which a decree of foreclosure has been passed, subject to the first and second mortgages, and reserving all the rights of the county of St. Louis. The first and second mortgagees are not before the court on the present application, but the application is resisted by the third mortgagees, between whom and the county of St. Louis the present controversy exists.

The point of contest is this: The county claims that it is entitled to a lien or equitable charge upon the earnings of the railroad company to the extent necessary to pay the interest on the $700,000 loan, and to continue until the bonds of the county are paid by the railroad company or the purchasers of the property and franchises thereof, under the decree of foreclosure, and that the lien or charge specifically attaches to the earnings of the road, and follows the road into whosesoever hands it may pass. On the other hand, the mortgagees maintain that the obligation of the railroad company to the county is unsecured—that it is a debt at large—or, at all events, that the right of the county is subordinate to the rights of the mortgagees and of the purchaser at the foreclosure sale. The question has been very fully and ably argued at the bar, [and as a result of that argument has led us both to a clear conviction.] [2] We proceed to state our conclusion, and, briefly, the grounds upon which it rests.

The determination of the point in issue must depend upon the intention of the legislature and of the parties in interest at the time (1865) when the county made the loan. These parties mainly were, the state (which sustained at that time the double relation of sovereign and creditor towards the railroad company), the railroad company, and the county of St. Louis. The intention of the parties must be gathered from the language of the act of January 7, 1865, and the resolutions and acts of the company and of the county in executing the authority it conferred, these being viewed in the light reflected on them by the known circumstances surrounding the parties and the object which was intended to be accomplished.

To these extrinsic circumstances, shown in the legislative history of the road, the briefest reference only will be made. In 1849 the legislature chartered the Pacific

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [From 3 Cent. Law J. 704.]

Railroad Company with power to build a line of railway nearly three hundred miles long, from St. Louis to Kansas City. In 1851 the work of construction commenced, and in that year, and down to 1855, the legislature had passed acts loaning the credit of the state to the company to aid and secure the completion of the road. This aid was in the shape of state bonds, having not less than twenty or thirty years to run from the date of their issue. The company agreed to make provision for the payment of these bonds, interest and principal, and the state was secured by a statutable lien, with power of sale. Down to and during 1855, $7,000,000 of state bonds had been issued. Down to 1861, when the rebellion broke out, only about one hundred and eighty miles of the road had been completed. The civil war suspended the work of constructing the road; nor was the work resumed until the legislature passed the act of February 10, 1864 (Laws 1864, p. 50), which has a material bearing upon the present controversy. This act authorized the company to borrow $1.500,-000 to complete the road, to be secured by a first lien on the line west of Dresden, the state waiving for this purpose and to this extent its prior lien. The money was obtained, and while the company was extending its road, in 1864, the road was "raided" by the insurgent forces, and further aid was needed, both to repair the injuries and to complete the line. The act of February 10, 1864, contains provisions in respect to the fund commissioner, who is referred to in the act of January 7, 1865, which it is essential to notice. The office of fund commissioner was created by the act of 1864, which provided that the office "shall continue until bonds (i. e. the Dresden bonds, so called) issued for the completion of the road, 'and the said state bonds loaned to the said company,' with interest thereon, are fully paid or exchanged for the first mortgage bonds of said road, as hereinafter provided."

"Sec. 2. All gross earnings of the road, from all sources, shall be paid in, daily, to said fund commissioner, and all other sources of revenue shall be under his control and possession as they arise."

This officer was to pay out all moneys for construction and equipment and for operating the road. The duty of this officer in the application of the net earnings of the road is prescribed by section 7, as follows: 1. his salary; 2. interest of first mortgage bonds exchanged under the act; 3, dividends on the preferred stock, which the act authorized to be created, and the surplus to the purchase of outstanding state bonds. The state was thus, in 1864, in full possession of all the revenues of the company upon certain express trusts, and this possession it was contemplated and provided should continue until "the state bonds loaned to the railroad company," having still many years to run, and upon which the Pacific Railroad Company had paid no interest since July, 1859, were paid or exchanged. It may be implied from the legislation of March 31, 1868, hereafter adverted to, that the holders of state bonds did not exchange them for bonds of the company under section 6, nor convert them into preferred stock under section 8, of the act of February 10, 1864. Now, in this condition of affairs— the state, by its fund commissioner, in possession for its own security of all the revenues of the road, the road without credit and in a ruinous condition, and its line uncompleted, the funds derived from the Dresden bonds exhausted, and further aid being necessary—the act of January 7, 1865, was passed, the object of which was to secure the needed assistance by the loan to the company of the credit of St. Louis county to the extent of $700,000. Section 1 of the act last named authorized, but did not require, the county court to loan the company its seven per cent. twenty-years bonds "for the completion of the road," upon such conditions as the county court and the directors of the company might agree upon, subject, of course, to the provisions of the act itself. The county court accepted the act. The board of directors of the company likewise accepted it, and agreed to observe and faithfully perform its obligations, and soon afterwards the bonds of the county were issued and the proceeds used by the company to complete its road. The road was finished the following year, and the interest on the bonds has been paid by the company to the county down to and including May, 1876.

What provision was made to secure the county for this large loan to the company? It was not a gift or donation by the county. It was not a purchase by the county of the stock of the road. The act only authorized the county to loan its credit or bonds to the company. The company was, as we have seen, in no condition to meet the interest on the bonds unless the provisions in the act of 1864 for the sequestration of its revenue by the state, and for the benefit of the state, were modified. Hence we see the object and necessity for the second section of the act of January 7, 1865. It can hardly be supposed that the county would loan this large sum to a company whose property was already mortgaged to the extent of nearly or over ten millions of dollars, including unpaid interest, and all whose revenues were appropriated and actually going into the possession of the state, and were to continue to go there until the large debt to the state was paid. Accordingly, we find that the second section of the act made, and was intended to make, effectual provision for the security of the county. That section is as follows:

"Sec. 2. The fund commissioner of the Pacific Railroad, or such person as may at any time thereafter have the custody of the funds of said railroad company, shall, every month after said bonds are issued, pay into the county treasury of St. Louis county, out of

the earnings of the Pacific Railroad Company, $4,000, and $1,000 additional in each month of December, to meet the interest on said seven hundred bonds; said payment to continue until said bonds are paid off by the Pacific Railroad."

Now, the effect of this section, when accepted and acted upon by the county and company, was simply this: Before this, the state had a complete and perfect lien upon and right to receive all the earnings of the company; but in favor of the county, to the extent of $700,000, it impliedly consented to waive its lien and right to receive all the earnings, and the county was pro tanto substituted as to the $49,000 per year in the place of the state, with a lien or charge to that extent as effectual as the state before possessed. Why is this not the effect of what was done?

The principal parties in interest in this transaction were the state, the Pacific Railroad, and the county, and they all agreed to the arrangement. As respects the state, the effect of the acceptance of this act by the company and the county was, that the state consented to waive in favor of the county its prior right to the $49,000 per year out of the earnings of the company. As between the company and the county, the effect of the acceptance of the act and this issue of the bonds by the county under it, was to convert the provisions of the second section into a contract, by which the company consented that the fund commissioner, who had the right to receive all its funds, or any other person who should at any time thereafter have the custody of its funds, should every month, out of the earnings of the railroad, pay the specified sum necessary to meet the interest on the bonds, which payment, it was provided, should continue until said bonds were fully paid by the railroad company. Unless something has since changed the rights and relations of the company and the county, it seems almost too clear for argument that this constituted a specific appropriation by the company, with the consent of the state, of $49,000 per year of the earnings of the company, in the hands of a trustee, in favor of the county. If the fund commissioner was still "in esse," and in receipt of the earnings of the road, can it be doubted that, at the instance of the county, he could be compelled, by mandamus or other proper proceeding, to pay the specified sum each month into the county treasury? Here was a consummated contract. The fund out of which the payment was to be made, the amount, the place and purpose of the payment, were all definitely fixed, and the duty of making the payment was absolutely declared. It is certain there was no change in the relation of the parties down to the act of March 31, 1868, by virtue of which the Pacific Railroad, in consideration of $5,000,000 paid to the state, procured a release for all existing claims, title, and interest of the state

in and to the Pacific Railroad and its property. The effect of the act, in this regard, has been authoritatively settled in the case of Murdock v. Woodson [Case No. 9,942]; same case on appeal, 22 Wall. [89 U. S.] 351. It is not necessary to refer more at large to what is there decided. It is only material here to notice that the act of 1868 recites the existence of the debt to St. Louis county, and makes provision for its payment in case the road should be sold. But if it should not be sold, and if the provisions of the fifth section of the act should be accepted by the company, as turned out to be the case, then the company remained in esse, and the owner of its property and franchises, and no further provision than then existed for St. Louis county was necessary.

As the act of 1868 made provision for closing the relations of the state as a creditor of the company, it abolishes the office of fund commissioner (section 12). It has been contended in argument by the counsel for the mortgagees, that the effect of the repeal of this office was to terminate any trust which the second section of the act may have created in favor of the county; but there is a satisfactory answer to that position, even if the legislative power over the rights of the county be as absolute and unlimited as claimed by the counsel. In the legislation of 1868, the general assembly, so far from evincing an intention to impair or destroy the rights of the county, whenever it made any provision in that regard it was one recognizing and intended to secure and protect those rights. Besides, the contingency of the repeal of the office of fund commissioner was anticipated in the second section of the act authorizing the loan by the county to the company, and provision was made that, in that event, the duty which had before been devolved on that officer should, ipso facto, devolve "upon such person as might at any time thereafter have the custody of the funds of the railroad company."

It is our judgment that the effect of the agreement of the company with the county specifically to appropriate its earnings as provided by the second section of the act of 1865, is to create a lien or charge, statutable in its origin and equitable in its nature, on those earnings, as they arise, which may be enforced by the county, so long as bonds which it loaned to the company remain unpaid. This was the view expressed by Mr. Leighton, the attorney of the company at the time, as shown by his letter of January 10, 1865, and, in our opinion, is a sound exposition of the purpose and effect of the act.

It is not necessary to go into the general learning on the subject of equitable liens or charges, since the rights of the parties in the case before us essentially depend upon the construction of the act of 1865. But the accepted doctrine of courts of equity, in respect to equitable liens or charges, will be found, we think, to support the conclusion we have

reached. The cases clearly establish this legal proposition. If a debtor, by a concluded agreement with a creditor, sets apart a specified amount of a specific fund in the hands, or to come into the hands of another from a designated source, and directs such person to pay it to the creditor, which he assents to do, this is a specific appropriation, binding upon the parties and upon all persons with notice who subsequently claim an interest in the fund under the debtor. This proposition would sustain the right of the county in the present case.

It is urged, however, that the mortgagees under the third mortgage had no notice of the rights of the county. But they are bound to notice the acts of the legislature of 1865 and 1868—the one authorizes the lien or charge, and the other recites the fact that the county had made the loan, and that it was then unpaid. As the mortgage was made subsequent to both of these acts, the mortgagees are charged with notice of all that they contain. Demurrer overruled, with leave to answer. Ordered accordingly.

[NOTE. Subsequently the defendants answered the petition, a reply was filed, and proofs taken. The facts as reported by the master were accepted by both parties as correct. The case was then heard upon its merits, and it was decided that under the legislation applicable to this transaction, and upon the facts reported by the master, the county had an equitable lien upon the earnings, and a right to have the same appropriated to pay the interest on the bonds, as provided in the second section of the act of January 7, 1865, and that this charge attaches to the property sold under the deed of foreclosure. Case No. 7,740. An appeal from this decree was taken to the supreme court, and the decree was sustained. 101 U. S. 306. See note to Case No. 7,740. Upon the question of the foreclosure of the mortgages of the Pacific Railroad Company, see 3 Fed. 772, 12 Fed. 641, 95 U. S. 1, 101 U. S. 289, 111 U. S. 505, 4 Sup. Ct. 583. Upon the question of the right of certain counties to taxes as against the Pacific Railroad, see Case No. 7,738.]