TOMPKINS *v.* LITTLE ROCK & FT. S. RY. and others.

*(Circuit Court, E. D. Arkansas. October Term, 1882.)*

1. STATE LOAN—IN AID OF RAILROAD.

   The act of the legislature of Arkansas, providing for a loan of the bonds of the state to railroad companies, construed, and *held* (1) to create a statutory mortgage on the roads, and their income and revenues, to secure the payment of the state bonds by the companies accepting the loan; (2) that such lien took effect from the date of the award of the loan, by the board of railroad commissioners, to the company applying for the same; (3) that the duty of the governor to issue the bonds, after the award of the loan, was ministerial; (4) that all persons were bound to take notice of the lien reserved by the act, and when it accrued; (5) that the lien reserved to secure the payment of the bonds is primarily a security for those holding the bonds; (6) that as between the state and the company receiving the bonds, the company was the principal debtor and bound to pay the bonds, or furnish the state means for that purpose; and if the bonds are void as obligations against the state, the company which received and negotiated them as genuine is bound to pay them to *bona fide* holders, and the latter may enforce the lien reserved by the act to secure this result.

2. DEBTOR AND CREDITOR—LIEN BY CONTRACT—ENFORCEMENT.

   Where a creditor acquires the right by contract to seize and sell the property of his debtor, or sequester its income and revenues to pay the latter's debt, such contract necessarily imports and creates a lien on the property, which may be enforced by any lawful holder of the debt.

3. "INCOME AND REVENUES" OF A RAILROAD COMPANY.

   "Income and revenues" of a railroad company are all the income and revenues of the company, and necessarily embrace the "earnings" of its road.

4. MORTGAGES FOR FUTURE ADVANCES.

   It is a well-settled rule that where the mortgagee has the option to make the advances or not, each advance is as upon a new mortgage; but where the mortgagee is bound to make the advances, the lien relates back to the date of the mortgage, and is superior to any subsequent lien or conveyance.

5. NEGOTIABLE PAPER.

 The payee of negotiable paper who transfers it for value thereby guaranties the genuineness of the paper, and the truth of every recital on its face material to its validity and value.

In Equity.

On the twenty-first of July, 1868, the general assembly of the state of Arkansas passed an act to aid in the construction of railroads by a loan of the state's credit.

The provisions of the act upon which the material questions in the case arise are as follows:

"Section 1. For the purpose of securing such lines of railroad in this state as the interests of the people may from time to time require, the faith and credit of the state of Arkansas are hereby irrevocably pledged, and the proper authorities of the state will and shall issue to each railroad company or corporation, which shall become entitled thereto, the bonds of this state, in the sum of $1,000 each, payable in 30 years from the date thereof, with coupons thereto attached for the payment of interest on the same in the city of New York, semi-annually, at 7 per cent. per annum, in the sum of $15,000 in bonds for each mile of railroad which has not received a railroad land grant from the United States, and $10,000 in bonds for each mile of railroad which has received a land grant from the United States, on account of which such bonds shall be due and issuable as provided."

"Sec. 2. The board of railroad commissioners are hereby authorized and required to receive the application for the loan of state credit herein provided for, and to designate the roads entitled to the same."

"Sec. 7. The legislature shall, from time to time, impose upon each railroad company, to which bonds shall have been issued, a tax equal to the amount of the annual interest upon such bonds then outstanding and unpaid, which tax may be paid in money or in the past-due coupons of the state at par, and, after the expiration of five years from the completion of said road, the legislature shall impose an additional special tax of $2\frac{1}{2}$ per cent. per annum upon the whole amount of state aid granted to such company, payable in money or in the bonds and coupons of the state at par; and, if in money, the same shall be invested by the treasurer of the state in the bonds of the state, at their current market value. The taxation in this section provided to continue until the amount of bonds issued to such company, with the interest thereon, shall have been paid by said company as herein specified, in which case the said road shall be entitled to a discharge from all claims or liens on the part of the state: provided, that nothing herein contained shall be so construed as to deprive any company, securing the loan of the bonds of the state herein provided for, from paying the whole amount due from such company to the state, at any time, in the bonds of the state loaned in aid of railroads, or the coupons thereon, or in money.

"Sec. 8. In case any company shall fail to pay the taxes imposed by the preceding section at the time the same become due, and for 60 days thereafter, it shall be the duty of the treasurer of the state, by writ of sequestration, to

seize and take possession of the income and revenues of said company until the amount of said defaults shall be fully paid up and satisfied, with costs of sequestration, after which said treasurer shall release the further revenues of said company to its proper officers."

"Sec. 12. At the next general election to be holden under the provisions of section 3 of article 15 of the constitution of this state, the proper officers having charge of such election shall upon a poll, as in other cases, take and receive the ballots of the electors qualified to vote for officers at such election for and against this act, in compliance with section 6 of article 10 of the constitution,— such ballot to contain the words, 'For Railroads,' or 'Against Railroads;' and if it appear that a majority so voting have voted 'For Railroads,' this act shall immediately become operative and have full force, and all laws heretofore passed for loaning the credit of this state in aid of railroads shall cease and be void; but if a majority shall be found to have voted 'Against Railroads,' this act shall be void and of no effect."

The election mentioned in section 12 was held on the third of November, 1868, and a large majority of the votes cast were "for railroads." The general assembly which passed this act adjourned on the twenty-third of July, 1868, to meet on the seventeenth of November, 1868, and it did meet at that time, and did not adjourn *sine die* until the tenth day of April, 1869.

Another act on the same subject was passed, and went into effect on the tenth day of April, 1869, the material portions of which are set out in the opinion. State aid was awarded to the defendant, the Little Rock & Ft. Smith Railroad Company, to the amount of $1,500,-000, and bonds to the amount of $1,000,000 issued. After the bonds had been issued to and negotiated by the railroad company, the supreme court of the state, in 1877, decided they were unconstitutional and void, upon the ground that the act of July 21, 1868, was not in force when the election was held, in pursuance of the twelfth section of the act, to take the sense of the people at the ballot-box on the question of loaning the credit of the state, as required by section 6 of article 10 of the constitution. The reasoning by which this result was reached was as follows: The constitution provided that "no public act shall take effect or be in force until 90 days from the expiration of the session at which the same is passed, unless it is otherwise provided in the act;" and the court held that the adjournment of the general assembly on the twenty-third of July, to meet the seventeenth of November next, was not an "expiration of the session" within the meaning of this clause of the constitution, and that the provison in the act itself for holding an election under it did not sufficiently evince the legislative intent that it should be in force and effect for that purpose, and that an act could only be made to take effect before the

lapse of 90 days from the expiration of the session "by an express declaration in the act itself," which this act did not contain.

The defendant, the Little Rock & Fort Smith Railway, derives title to the railroad through the foreclosure of a mortgage executed by the railroad company on the twenty-second of December, 1869.

The award of state aid was made to the railroad company on the twenty-eighth of April, 1869, and the first issue of bonds thereunder was on the twenty-fifth of March, 1870, and the last on the twenty-third of February, 1873.

The plaintiff, a holder of state aid bonds issued to the railroad company, filed his bill, alleging that the acts of the legislature under which the bonds were issued, reserved and created a statutory mortgage on the road, and an equitable lien on its income and revenues, to secure the payment of the state bonds, issued to and negotiated by the company, and prayed for the enforcement of such lien in his favor. To this bill the railway company demurred. The following are the only grounds of demurrer much relied upon or necessary to be noticed:

(1) That the act of 1868 was not in force when the election was held under it, and that the consent of the people to the loan not having been given at an election held in pursuance of law, the act of 1868 and the bonds issued thereunder are unconstitutional and void. (2) That no lien in favor of the state or of any holder of the bonds is created or reserved by the act in question. (3) That the lien created by the mortgage deed under which the defendant, the railway company, claims title, is superior and prior to the lien, if any, reserved and created in favor of the state or the holders of the state bonds under the act of 1868.

*John McClure* and *John R. Dos Passos*, for plaintiff.

*C. W. Huntington*, for defendant, Little Rock & Ft. Smith Railway.

CALDWELL, J. We are confronted at the threshold of this case with the question, whether the acts of the legislature, under which the bonds were issued to the railroad company, created a statutory mortgage or lien upon the railroad, or an equitable lien or charge on its earnings and income, to secure the payment of the principal and interest of the state bonds.

Before discussing the provisions of the act relating to this question, it will be well to have an accurate understanding of the relation the state and company sustained to each other in the matter of the bonds. It was contemplated that the company would sell the bonds to raise money to build its road. They were loaned by the state to the company for that purpose. They were accommodation paper,

and, as between the state and the company, the company was the principal debtor and the state only a surety.

The company was bound to save the state harmless by paying the interest on the state bonds as it fell due, and the principal of the bonds at maturity, or provide the state with funds for that purpose. It was not necessary that this obligation of the company should be expressed; the law would imply it from the transaction itself. And if the loan was to constitute a debt at large against the company, without lien or security, there was no occasion for the act to have said more than that the bonds were loaned to the company for its accommodation. From such a contract the law would imply an obligation on the company to provide funds to pay the bonds. If more was said, it was probably said for a purpose, and with a view to secure performance of this duty on the part of the company.

In determining the question under consideration, the acts of 1868 and 1869 are to be construed together as one act, and considered in all their parts. By the terms of the act of 1869, the company was to provide the state with funds to pay the semi-annual interest on the state bonds three months before it fell due, and after five years was to pay $2\frac{1}{2}$ per cent. on the principal of the bonds annually, to raise a sinking fund with which the bonds might be anticipated, or liquidated at maturity.

The interest on the bonds fell due on the first day of October and April in each year. The treasurer of state was required to make requisition on the company for funds to pay the October interest on or before the first day of the preceding June, and a requisition to pay the April interest on or before the first day of the preceding December, and the company was to make payment within 30 days from the date of the requisitions, respectively, and if payment was not made within that time sequestration of the income and revenues of the company was to follow. It was not contemplated that the state should at any time pay the interest on these bonds out of her general revenues, and hence the provision giving the state power to sequester the income and revenues of the company to provide funds to pay the interest 30 days in advance of the time it fell due.

The stipulations and provisions of the acts constitute a contract between the state and the company, and that contract, like all contracts, is the law by which the parties to it are bound and are to be governed. Ordinarily, the legislative expression of the sovereign will binds all the citizens, whether they desire to be bound thereby or not. These acts are to be viewed in the double aspect of public statutes

and of a contract. But the contract is in no sense unilateral. The company was not bound to borrow the state bonds; the loan was tendered on certain terms and conditions, and when it applied for and accepted the bonds, it voluntarily assented to be bound by the provisions of the acts, which at once constituted a contract between the company and the state. By the terms of this contract, if the company did not pay the interest on the state bonds as stipulated, it authorized the treasurer of state, "by writ of sequestration, to seize and take possession of the income and revenues of said company until the amount of said default be fully paid up and satisfied, with costs of sequestration, after which said treasurer shall return the further revenues of said company to its officers." Such seizure and sequestration might be repeated from time to time as often as the company made default. The "claims and liens on the part of the state" were not to be discharged until "the bonds issued to such company, and the interest thereon," had been fully paid. Section 7. There is nothing mysterious or doubtful in the meaning of "sequestration" and "writ of sequestration," as used in the acts. The word is here used in its usual sense, and means "to seize or take possession of the property belonging to another, and hold it till the profits have paid the demand for which it was taken." Worcest.

This is precisely what the company agreed the state might do with its property if it failed at any time to furnish the state with the funds to pay the interest and principal of the state bonds according to the terms of its contract. Where a creditor acquires the right by contract to seize and sell the property of his debtor, or sequester the incomes and revenues of the same, to pay the latter's debt, such right, in equity, necessarily imports and creates a lien. Jones, Mortg. § 162.

A creditor at large possesses no such right, and cannot seize and sell the property of his debtor or sequester its income.

The terms "tax" and "taxation" are not used in the act in the sense of a tax that is to be assessed and levied for the support of the state or any of its subdivisions. A tax, in the legal signification of the term, has to be levied on all property "by a uniform rule," not only as to the rate, but in the mode of its assessment. Article 10, § 2, Const.; *Fletcher* v. *Oliver*, 25 Ark. 295.

Clearly, this word as used in the act has no reference to a tax in its strict legal signification. The sense in which a word is used in any given case is to be determined by the context.

Among the meanings of the word "tax" are "a requisition; a demand; a burden," (Worcest.;) and it is here used in the sense of a charge or burden, for which the state may make a requisition in the prescribed mode.

It is obvious, therefore, that what is said by the supreme court in *Haine* v. *Levee Com'rs,* 19 Wall. 655, that "taxes not assessed are not liens, and that the obligation to assess taxes is not a lien on the property on which they ought to be assessed," has no application to the case at bar. The taxes there spoken of are taxes, in the legal acceptation of the word, levied on the property of all the citizens alike to support the government or discharge a common burden.

It is argued that the right to tax or charge the "railroad company," and sequester its "income and revenues," did not give an equitable lien on the road itself for the income and revenues derived therefrom. The company was created to build and operate a railroad. Under its charter it could lawfully conduct no other business. From what source, then, was it expected to derive its income and revenues? Obviously from the operation of its road. How could the state sequester the income and revenues of the company without sequestering the income and revenues derived from the operation of its road; and how could the income revenues derived from that source be sequestered unless the state or her representatives had possession of the road?

In *Ketchum* v. *St. Louis,* 101 U. S. 306, the supreme court quotes approvingly what was said by the chancellor in *Legard* v. *Hodges:* "I take the doctrine to be true that when parties come to an agreement as to the produce of lands, the land itself will be affected by the agreement." Taking all the provisions of these acts into view, the implication is irresistible that it was the intention of the parties to fix a charge or lien on the railroad, or its earnings, or both, for the whole debt. This intention seems too obvious for serious question, and the court will give effect to that intention.

In *Ketchum* v. *St. Louis, supra,* the court approved the language used in another English case, where Lord Justice Turner said:

"There can, I think, be no doubt that it was intended by these agreements to create a charge upon the property of the company; but it is said on the part of the official liquidator that this intention was not well carried into effect. I apprehend, however, that where this court is satisfied that it was intended to create a charge, and that the parties who intended to create it had the power to do so, it will give effect to the intention, notwithstanding any mistake which may have occurred in the attempt to effect it."

But in the case at bar the intention of the parties to create a lien on the road, and its income and revenues, is not left to implication or interpretation. It is expressed in terms. The seventh section of the act declares:

"The taxation in this section provided to continue until the amount of bonds issued to such company, with the interest thereon, shall have been paid by said company as herein specified, in which case the said road shall be entitled to a discharge from all claims or liens on the part of the state."

When "shall the said *road* be entitled to a *discharge* from all claims or *liens* on the part of the state?" The answer given in the very language of the act is, *when* "the amount of bonds issued to such company, with the interest thereon, shall have been paid by said company as herein specified." If the state had no "lien" on the "road," why make provision for discharging it?

Again, the act (section 5, Act 1869) provides that, when the company has paid the debt, the treasurer of the state shall "withdraw said receiver from the management of its affairs."

"Affairs" is a word of large import, and a receiver having the management of the affairs of a railroad company must necessarily have the control and management of its road.

The receiver here spoken of was to be designated by the treasurer of the state, and to give such bond as he required, and was removable at his pleasure, thus in effect making him an agent of the state.

Any discussion of this question would seem to be unnecessary, in view of the decision of the supreme court of the United States in *Ketchum* v. *St. Louis*, 101 U. S. 306; S. C. 4 Dill. 78, under the title of *Ketchum* v. *Pacific R. Co.* In that case the act authorized the county to loan its bonds to the railroad company, and provided that the fund commissioner of the road, an officer theretofore created by law to receive the earnings and income of the road, to secure the state from liability on its bonds before that time loaned to the company, should pay into the county treasury, out of the earnings of the road, a specified sum to pay the interest and principal of the bonds which the county might loan to the company. This act was passed in 1865, and the same year the county agreed with the company to issue the bonds. But this agreement was not carried out and no bonds were issued under it until 1875. For a period of 10 years this agreement lay dormant. In the mean time, in 1868, the office of fund commissioner was abolished. *Ketchum* v. *Pacific R. R.* 4 Dill. 85, 86. This was the condition of affairs when the company executed one or more mortgages on its road. One of these

mortgages was executed six years after the date of the agreement between the county and the company, for the loan of its bonds, and four years before they were issued, and three years after the office of fund commissioner had been abolished, and the company had come into the full enjoyment of its earnings and income. And on this state of facts the court held that the equitable lien of the county for the bonds loaned had relation back to the date of the agreement for the loan, and was superior and paramount to that of the mortgage. This conclusion was reached upon the ground "that all parties claiming under mortgages executed after the acceptance of the act of 1865, are chargeable with notice of the appropriation of the earnings made by that act;" that this appropriation of the earnings constituted an equitable lien; and that "with that lien the property itself was chargeable by whomsoever it, or the funds accruing therefrom, are or may be held." It is futile to say that there is a distinction between a pledge or appropriation of the "earnings of the road," as in the *Ketchum Case,* and the "income and revenues of the company," as in the case at bar. The "income and revenues" of a railroad company are *all* the income and revenues of the company, and, necessarily, embrace the "earnings" of its road.

Undoubtedly it would have been competent for the legislature to have loaned the state bonds to the railroad companies on their corporate credit alone. But such action, on so extended a scale, would have been without precedent in the history of the country, and would practically have amounted to a donation of the bonds to the companies receiving them. It is part of the public history of the state, and the records of this court disclose the fact, that insolvency was the fate of every company which borrowed state bonds, and that not one of them now possesses any corporate property, and some of them, probably, not even a corporate existence. One did not have to be endowed with prescience to foresee such results. The commonest understanding could not fail to see they were possible, and even probable. To suppose the legislature did not apprehend these results, or that, apprehending them, it made no provision to protect the state from loss, in such a contingency, is to impute to that body a want of common understanding, or a flagrant disregard of the plainest dictates of duty. Neither of these imputations is well founded.

Was this lien prior in point of time and superior to the mortgage under which the defendant claims? The award of state aid was made on the twenty-eighth of April, 1869, and the mortgage, under which defendants claim, was executed December 22, 1869, and recorded

February 7, 1870. The first issue of state bonds to the company was on the twenty-fifth day of March, 1870, and the last on the twenty-first day of February, 1873.

The rules applicable to mortgages for future advances furnish the correct solution to this question. One of these rules now firmly established is that where the mortgagee has the option to make the advances or not, each advance is as upon a new mortgage; but where the mortgagee is bound to make the advances, the lien relates back to the date of the mortgage, and is superior to any subsequent lien or conveyance. *Ackerman* v. *Hunsucker*, 21 Hun, (N. Y.) 53; *Brinkmeyer* v. *Browneller*, 55 Ind. 487; S. C. 4 Cent. Law J. 370; *Bissell* v. *Gowdy*, 31 Conn. 47; S. C. 3 Amer. Law Reg. (N. S.) 79; *Nelson* v. *Iowa Eastern R. Co.* 8 Amer. Ry. Rep. 82 , 1 Jones, Mortg. §§ 370, 373, 378.

When, then, did the state become bound to issue its bonds to the railroad company? The act is very explicit on this point. After prescribing the mode in which application for state aid shall be made, the fourth section declares that if the "board of railroad commissioners shall consent to approve and grant such application, then and thereafter the said railroad company or corporation shall be entitled to, and have a right to ask for, demand, and receive the bonds of the state hereinbefore declared to be pledged and granted, upon complying with and fulfilling the terms and conditions hereinafter set forth."

And the next section enacts "that any railroad company or corporation which shall have acquired the right to demand and receive state aid, by virtue of the official certificate in the preceding section specified, and claiming an issue of bonds in its behalf, shall first file in the office of secretary of state the following papers." Here follows an enumeration of the papers to be filed, and which only could be filed after the award had been made.

And when these papers are filed the sixth section declares "that thereupon the governor, or the person filling for the time being the executive office, shall issue to the president of said company the bonds of the state of Arkansas, bearing the seal of the state, attested by the secretary of state, as provided in section 1 hereof, upon the completion and preparation for the iron rails of each succeeding 10 miles or more, until the entire line or lines of road of said railroad corporation shall be completed." And, by the terms of the first section of the act, "the faith and credit o. the state of Arkansas is hereby irrevocably pledged, and the proper authorities of the state

will and shall issue to each railroad company or corporation, which shall become entitled thereto, the bonds" of the state.

These provisions of the act are conclusive upon this question. Under them the moment the award was made by the commissioners it amounted to a concluded and irrevocable contract on the part of the state to issue the bonds of the state to the company upon its filing the required vouchers. The award was made on the application of the company, by the board of railroad commissioners, who alone had the power and authority to award the aid. When, as in this case, the application of the company asked an award of aid for the whole line of the company's road, and it was awarded, their powers and duties, so far forth as related to that road, were at an end. The process did not have to be repeated upon the completion of every 10 miles of road. The act did not contemplate the issue of any bonds at the time the aid was awarded; they were to be issued, the first installment, when 10 miles of the road had been constructed, and a like installment upon the completion of each 10 miles thereafter.

What the company was required to do after the award of the aid, and before it received the bonds from the governor, was to file certain papers and vouchers which could only be filed after the award. There was no further contract to be made between the company and the state. And upon filing the requisite vouchers it was made the duty of the governor to issue and deliver to the company the bonds of the state, according to the terms of the award. No discretion was vested in the governor. His power and duty to issue the bonds was found in the award of the commissioners, and not in any new contract. There was no convention between him and the company. He had no power to enter into any contract with the company. After the company had qualified itself to receive the bonds, his duty was merely ministerial, and was enjoined upon him in the most peremptory terms by the sixth section of the act. A ministerial act is well defined to be "one which a person performs in a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." *Flournoy* v. *City of Jeffersonville,* 17 Ind. 169. The duties devolved upon the governor fall exactly within this definition.

The proceeds of the bonds were to be used in building the roads, and by the third section of the act it was made the duty of the board

of railroad commissioners to inspect the roads and see that the state aid was being applied in the manner required by the act; and if any road was not so applying it the board was required to indicate that fact to the governor, whose duty it then was to suspend the further issue of bonds to such company until the next meeting of the legislature, when the facts were to be reported to that body for its consideration. This provision shows, quite conclusively, that the board had no power to revoke or suspend an award of aid once made, and that the governor not only had no power to refuse, at his discretion, to issue bonds after the award of aid, but that he could not, on his own motion, suspend the issue of bonds for the misuse of the bonds previously issued. The act embodied a policy, carefully matured by the legislature, for developing the resources of the state, by promoting the construction of important lines of railroad by the loan of the state's credit, and it was contemplated that it should receive the sanction of the people of the state at the ballot-box.

It would be singular indeed if, after such a measure had received the sanction of the legislature and the approval of the people at the ballot-box, the act had put it in the power of a single officer of the state to defeat both the legislative and the popular will at his discretion. A careful reading of the act gives evidence of a settled intention on the part of the legislature not to invest the governor with any discretion in the premises.

The amount for which the state might acquire a lien, under the award, was fixed and definite; it was for the sum of $10,000 per mile for 150 miles.

The validity of a mortgage or lien, for advances to be made to the mortgagor, was never doubted merely because it contained no covenant making it obligatory on the mortgagor to apply for and receive the maximum sum agreed to be advanced, by the mortgagee. Whether the company might have declined to file the requisite papers and take the bonds, after applying for and receiving the award, is an immaterial question. The essential question is, whether, by the award of the commisioners, the company had in its power to compel the state to make the loan; or, in other words, whether the company could, without further negotiations with the state, make it the legal duty of the governor to issue the bonds. It not only could do this, but it actually did do it. It does not, therefore, affect the validity of such a lien or mortgage, or in any manner impair its efficacy as against subsequent incumbrances, that the mortgagor is required to show in

some proper mode, before he receives each installment, that he has complied with the conditions of the mortgage that entitles him thereto; as, for instance, that all prior installments have been expended in the mode agreed upon; or, as in the case at bar, that 10 additional miles of railroad have been graded and put in readiness for the iron rails.

Whenever the mortgagee is bound to make the advances upon compliance with those and like conditions on the part of the mortgagor, the mortgage creates a binding contract between the mortgagor and the mortgagee, and a valid lien, as of its date, for all advances which are made in conformity to its provisions; and subsequent mortgagees, and those claiming under them, are bound to regard such a mortgage as a valid lien for the utmost amount that the mortgagor has a right to demand shall be advanced to him under it. If less is advanced it is their good fortune. If the full sum is advanced they cannot complain. They had notice and took the risk.

It was implied, in the application of the company for state aid, that it was qualified and entitled to receive the same, and would produce the requisite vouchers and papers to authorize the governor to issue the bonds, and that it would apply the proceeds of the bonds as required by the act. The moment the award was made, on the application of the company, every requirement of the statute, relating to the issue of the bonds, assumed the shape of a statutory contract, binding alike upon the state and the company, and no third party will be heard to complain that the state and the company complied strictly with their express and implied obligations to each other.

In *Ketchum* v. *St. Louis, supra*, the lien was an equitable one, created by a statute, which antedated the creation of the debt 10 years; but when the debt was created by the issue of the bonds, it had relation back to the date of the contract under the statute authorizing their issue, and cut out all intervening liens. So familiar is this principle that it was not even adverted to in the opinion of the court, and it is only by reference to the facts, as given in the opinion, (pages 310, 311,) that we discover that it was applied in that case.

These were public acts, and all persons are bound to take notice of any lien, charge, or security reserved to the state by them. *Memphis & L. R. R. Co.* v. *State*, 37 Ark. 642; *Ketchum* v. *St. Louis, supra*.

It is alleged in the bill, and admitted by the demurrer, that the promoters, owners, and officers of the defendant company, at its cre-

ation and organization, were the stock and bond holders of the old company, and that the defendant acquired the property with the full notice, in fact, of the whole transaction between the latter company and the state, and took it, therefore, charged with all the equities and liens in favor of the state or the holders of the state bonds, to which it was subject in the hands of the old company. The award of state aid was made, and the acts of 1868 and 1869 were both in force before the execution of the mortgage under which the defendant claims.

The state issued the bonds and delivered them to the company, in accordance with the statutory contract, to an amount aggregating $1,000,000. These bonds were put upon the market and sold by the company for money, which was used to build its road as contemplated by the act. Afterwards, and in 1877, the supreme court of the state decided that the provisions of the act of 1868, providing for holding an election to take the sense of the people on the question of loaning the credit of the state as therein provided, were not in force when the election was held, and that the consent of the people to such loan not having been "expressed through the ballot-box," as required by section 6, art. 10, of the constitution, at an election held in pursuance of law, the bonds were void and imposed no obligation upon the state. *State* v. *Little Rock, M. R. & T. Ry. Co.* 31 Ark. 701.

Assuming, but not deciding, that the ruling of the supreme court of the state, in the case last cited, is a sound exposition of the law, or that, whether so or not, it is binding upon this court, we will proceed to inquire, in the light of that decision, into the relative rights and obligations of the holders of the state bonds and the railroad companies. The holders of the bonds were not before the court in that case, and the question of their rights, and the effect of the decision upon the statutory lien, for the payment of the bonds, was not decided. The court, at the conclusion of the opinion in that case, are careful to say: "The question of lien upon the road, and its effects, need not be considered."

We are spared the necessity of extended discussion, or, indeed, of any discussion at all, of the remaining questions in this case. They have all been decided by the supreme court of the United States in *Railroad Cos.* v. *Schutte,* 103 U. S. 118.

The state of Florida, like the state of Arkansas, adopted the policy of aiding in the construction of railroads within the state by loaning its negotiable bonds to railroad companies. In the Florida case, as in the case at bar, the railroad companies were to pay the interest and the principal of the state bonds according to their terms, and

performance of this obligation was secured by statutory liens on the roads. After the bonds had been issued and negotiated by the companies receiving them, the supreme court of that state decided they were unconstitutional and void, and imposed no obligation on the state; but the court also decided that this did not relieve the railroad companies from their obligations to pay the bonds, and that the statutory lien was good, and could be enforced against the company by the *bona fide* holders of the state bonds. *State* v. *Florida Cent. R. Co.* 15 Fla. 690; *Trustees of Impr. Fund* v. *Jacksonville, P. & M. R. Co.* 16 Fla. 708.

Subsequently, a suit brought by the holders of state bonds against the railroad companies, to compel payment of the bonds and foreclose the statutory lien created to secure the payment, came before the supreme court of the United States, (*Railroad Cos.* v. *Schutte, supra,*) and that court held that the *bona fide* holders of the state bonds could recover the amount of the same from the railroad companies which negotiated them, and were entitled to have enforced in their favor the statutory lien given for their security. Before quoting from the opinion of the court, attention will be called to the only particulars in which the facts in that case vary from the case at bar.

(1) In the Florida case the act provided that the railroad companies should execute to the state their non-negotiable bonds, payable to the state at the same time and place and for like amounts as the state bonds. These bonds were secured by a statutory lien, and were executed in pursuance of the act requiring the issue of the state bonds, and were given by the companies in exchange for the bonds of the state. When the companies paid their bonds to the state, the state was to apply the money to the payment of her bonds issued and loaned to the companies. In that case, as in this, the object of the statutory lien was to compel the companies to provide the state with funds to pay the principal and interest of her bonds, loaned to the companies, as the same fell due.

It is not contended that the execution by the company of these non-negotiable bonds, payable to the state, can either add to or diminish the effect of the statutory mortgage, or the rights of the holders of the state bonds thereunder.

(2) The bonds in that case were not payable to the companies to which they were issued, but to "bearer," and they did not disclose, on their face, under what act or for what purpose they were issued, but the governor put an extraofficial certificate on them to this effect:

"This bond is one of a series, issued in aid of the Jacksonville, Pensacola & Mobile Railroad Company, to the extent of $16,000 per mile upon completed road; the state of Florida holding the first-mortgage bonds of said railroad company for a like amount, as further security to the holder hereof."

In the case at bar the bonds are payable to "the Little Rock & Fort Smith Railroad Company, or bearer," and they contain on their face this recital:

"Issued in pursuance of an act of the general assembly of the state of Arkansas, approved July 21, 1868, entitled 'An act to aid in the construction of railroads,' the said act having been submitted to and duly ratified by the people of the state at the general election held November 3, 1868."

In the Florida case the supreme court said (page 139) that "the certificate of the governor, as to the security held by the state, is, in legal effect, the certificate of the company itself, and is equivalent to an engagement on the part of the company that the bond, so far as the security is concerned, is the valid obligation of the state. The case is clearly within the reason of the rule which makes every indorser of commercial paper the guarantor of the genuineness of the instrument he indorses. We cannot doubt that, under these circumstances, the company is estopped, so far as its own liabilities are concerned, from denying the validity of the bonds. Having negotiated them on the faith of such a certificate, the company must be held to have agreed, as part of its own contract, whatever that was, that the bonds were obligatory." These observations of the court are applicable to the case at bar. If the recitals in the bonds in the one case, and the governor's certificate in the other, are contrasted, the superior force and strength of the former, for the purpose of creating an estoppel against the company, cannot escape attention.

By negotiating bonds payable to itself with this recital, the company must be held to have represented that they were issued under a valid act of the general assembly, and that the proposition contained in the act to loan the credit of the state to the railroad companies had "been submitted to and duly ratified by the people of the state." The recital, in legal effect, makes the act a part of the bond. The extract from the opinion of the supreme court on this point is an answer to the argument of the learned counsel for the defendant that the purchasers of the bonds had no right to rely on the recitals they contained, as against the company, and that the latter was not estopped to deny their truth.

The authorities cited by counsel to support his contention are the familiar ones that neither the state nor any other *public* corporation

is bound by false recitals as to the existence of its *power* to issue negotiable bonds. The soundness of that proposition is not questioned. Undoubtedly, as respects the power of a public corporation to issue bonds, recitals in the bonds themselves cannot operate by way of estoppel as the equivalent of a statute conferring the power.

But this principle has no application to the case at bar. This is not a suit against the state. It is a suit against the payee and transferrer of state bonds, containing recitals which, if true, made the bonds what they purported on their face to be, legal and binding obligations of the state.

And the rule is that the payee of negotiable paper, who transfers it for value, thereby guaranties the genuineness of the paper, and the truth of every recital on its face material to its validity and value. Byles, Bills, [157;] 2 Pars. Notes & Bills, 39.

The railroad company had the power to negotiate the state bonds, and to incur all the obligations implied by that act. It received them for that purpose, and is as completely estopped to deny the truth of its representations, made by recitals in the bonds, as a natural person would be under like circumstances. The recitals do not bind the state, but, as between the company and those who purchased the bonds from it, they do bind the company. The distinction here adverted to is so well understood that in the Florida case it went without the saying.

Every purchaser of a bond from the railroad company had the right, therefore, to assume that these recitals, which the company indorsed as true by putting the bonds on the market, were true in fact. And, as between the purchaser of the bond and the railroad company, the former was not required to look or inquire further.

The purchaser, by reference to the act referred to in the recital in the bonds, would see that while the bond was the bond of the state, the debt was in fact the debt of the railroad company, which was bound to provide the state with funds to pay it, and that the payment of this debt was secured by a statutory lien on the railroad, and its income and earnings. And knowing these facts, the purchaser would also know that, if for any reason the state declined to pay the bonds, he would be entitled to be subrogated to the rights of the state, under the statutory lien, to secure payment of the debt represented by the bonds. This is no new doctrine. It is founded on principles of reason and justice, as old as equity jurisprudence itself. Mr. Sheldon, in his work on Subrogation, says:

"The broad doctrine has also been often asserted that equity will regard security, given by a principal debtor to his surety, though merely for the surety's indemnity, as a trust created for the payment of the debt, and will see that it is applied for that purpose, by substituting, if necessary, the creditor to its benefit." Section 163. "The security for the debt, in whosesoever hands it may be, is treated as a fund held in trust for the payment of the debt; if it is in the hands of the creditor, the surety, upon paying the debt, will be subrogated to it for indemnity; if it is in the hands of a surety, the creditor may resort to it to secure the payment of his demand." Section 155.

The authorities cited by the learned author support the text.

In *Rice's Appeal*, 79 Pa. St. 206, the court says:

"The principle is well settled that where a surety, or a person standing in the position of a surety, for the payment of a debt, receives security for his indemnity, and to discharge such indebtedness, the principal creditor is in equity entitled to the benefit of that security, and it makes no difference that the principal creditor did not know of this at the time, or give credit on the faith of it."

The case of *Hand* v. *S. & C. R. R.* 12 S. C. 314, was in some of its features not unlike the case at bar, and the court said: "A provision for the payment of the bonds is primarily a security for those holding the bonds. It is always so in equity and at law when its forms permit."

There is, however, no occasion to invoke the doctrine of subrogation. The very object of the statutory mortgage was to secure the payment of the state bonds by the company. In the Florida case the supreme court say: "In our opinion there is no occasion for applying here the doctrines of subrogation, because in unmistakable language the statute has made the mortgage of the company security for the payment of the obligations of the state." By the provisions of the seventh section of the act of 1868, the road was not to be discharged from the claim or liens on the part of the state until "the amount of bonds issued to such company, with the interest thereon, shall have been paid *by said company*." The company was to pay the bonds, and the statutory mortgage was taken to secure that result, and stands as a security for that purpose to every bondholder.

It is contended that if the provision of the act of 1868 in relation to the issue of the state bonds is void, the one in relation to the statutory lien is void also. This was the contention before the supreme court in the Florida case, and was thus answered by the court: "It is contended, however, that as the provision of the act in respect to the execution and exchange of the state bonds is unconstitutional, the one in relation to the statutory lien on the property of the com-

pany is void also, and must fall. We do not so understand the law. Undoubtedly a constitutional part of a statute may be so connected with that which is unconstitutional as to make it impossible, if the unconstitutional part is stricken out, to give effect to what, taking the whole together, appears to have been the legislative will. In such a case the whole statute is void; but in this, as in every other statutory construction, all depends upon the intention of the legislature, as shown by the general scope of the law. To our minds it is clear, in the present case, that the object of the legislature was not to create a debt which the state was expected to pay, but to aid the company in borrowing money upon the credit of the state. As between the state and the company the debt for the money borrowed was to be the debt of the company. If the state paid its bonds from its own funds, the mortgage could be enforced to compel the company to make the state good for all such payments. If the state did not pay, then the creditors had their own recourse upon the mortgage. The state credit, so far as the state and the company were concerned, was only to aid the company in borrowing money on its own bonds. In any event, the company was to be bound for the payment of the entire debt when it matured, and its property was to be given as security. Under these circumstances, it seems to us that the unconstitutional part of the statute may be stricken out, and the obligation of the company, including its statutory mortgage in favor of the state bond-holders, left in full force. The striking out is not necessarily by erasing words, but it may be by disregarding the unconstitutional provision, and reading the statute as if that provision was not there. These bonds, as state obligations, were void, but as against the company, which had actually put them out, they were good." This judgment of the supreme court, in a case on all fours with the case at bar, concludes the question. And see *Johnson* v. *Griswold,* 2 Mo. Ct. App. 150.

A single question remains. The act of 1869 was repealed by the act of May 29, 1874. This repeal does not affect the rights of the parties to this suit. All contracts made under the act, or of which it constituted a part, and the rights acquired by such contracts, are unaffected by the repeal. The obligations of the railroad company to the holders of the state bonds, and the rights acquired by the latter, whatever they may have been, under and by virtue of that act, remain to be enforced the same as if no repeal had taken place. If this were otherwise, the act of 1868 would still remain, which contains all the essential provisions embraced in the act of 1869.

It is believed the conclusion reached is in accordance with well-settled principles of law, and the authority of adjudged cases binding on this court; and it unquestionably is in harmony with the plainest principles of justice. The company borrowed these bonds and put them in circulation upon a distinct engagement that it would provide the funds to pay them, and it gave its assent to the statutory lien on its road to secure this result. It sold them to innocent parties for money to build its road. It has received all the benefits that were expected to accrue to it under the contract, and the road and its earnings remain bound for the performance of the contract by the company. There is no principle upon which this obligation can be avoided, either by the company or subsequent purchasers with notice of the equities of the state bondholders. It would be a reproach to the law if there was.

The demurrer to the bill is overruled.

McCRARY, J., concurs.