## CARTER v. SAPULPA & I. RY. CO. *et al.*

No. 6436.  Opinion Filed December 7, 1915.

(153 Pac. 853.)

1.  **RAILROADS—Debts—Equitable Lien — Creation — Enforcement.**
    As an inducement therefor, and contemporaneously with the procurement of a loan, the board of directors of an electric railway company delivered to the party from whom the loan was sought resolutions of the board authorizing the loan, the issuance of the bonds of the company, and the making of a deed of trust upon the company's assets to secure the payment of the bonds;

Carter v. Sapulpa & I. Ry. Co. et àl.

which resolutions provided that a portion of the bonds to be so issued should be used as collateral security for the loan. Thereafter a certificate was given the lender, acknowledging that the railway company had obligated itself to deliver as collateral the bonds of the company as soon as issued and ready for delivery, which certificate, together with an order to pay the loan out of the proceeds of the sale, or hypothecation of the bonds, was forwarded to and received by the trustee in the deed of trust executed pursuant to the resolutions. **Held,** from the foregoing, and from the undisputed evidence of the intention to secure by mortgage, the lender acquired an equitable lien upon the assets of the railway company as security for the payment of his loan; that the intention to give security upon the property of the company being clear, equity will establish and enforce such charge or claim, not only against the company, but also against third persons who are either volunteers or who take the property on which the lien is agreed to be given, with notice of the agreement.

2. **MORTGAGES—Agreement to Give Mortgage—Effect.** It is a general rule that an agreement to give a mortgage or security on certain property, not objectionable for want of consideration, is considered in equity as a mortgage, upon the principle that equity will treat that as done which by agreement should be done.

3. **RAILROADS—Debts—Equitable Lien—Validity.** The intention being to secure, the fact that the bonds were not certified by the trustee as required by a provision of the trust deed, and hence were never delivered to the railway company, will not serve to defeat the equitable lien of the lender; his security in no wise being dependent upon the manner of execution and certification of the bonds.

4. **RAILROADS—Debts—Equitable Lien—Avoidance—Corporations.** The fact that some months thereafter the railway company, through the board of directors, by resolutions attempted to rescind and annul its former action in the form of the original resolutions, upon which the lender relied and depended in making the loan, will not defeat or impair the right of the lender to an equitable lien.

(Syllabus by the Court.)

*Error from District Court, Creek County;*
*Wade S. Stanfield, Judge.*

Action by the Fidelity Trust Company of Kansas City, Mo., as trustee, against the Sapulpa & Interurban Railway Company and others. From judgment denying defendant

S. E. Carter the relief asked for in his answer and cross-petition, he brings error. Reversed and remanded.

*Allen McReynolds,* (*McReynolds & Halliburton,* of counsel), for plaintiff in error.

*S. P. Freeling,* Atty. Gen., for the State.

*McDougal & Lytle,* for the State and General Electric Co.

SHARP, J.  February 1, 1908, the Sapulpa & Interurban Railway Company executed and delivered to the Fidelity Trust Company, as trustee, its certain mortgage or deed of trust to secure the payment of the bonds of said company, of even date therewith, in the sum of $50,-000. Said bonds were made payable to the holder at the office of the Fidelity Trust Company, in Kansas City, Mo., on the 1st day of February, 1918, and bore interest from date at the rate of 6 per cent. per annum, payable on the 1st days of February and August of each succeeding year, according to the terms of coupons attached to said bonds. Default having been made in the payment, at maturity, of the interest coupons, and of taxes assessed and levied against the mortgaged property, the plaintiff as trustee, on April 15, 1913, instituted in the district court of Creek county a suit to recover the principal and interest due on said bonds (alleged to be the property of the defendant St. Louis Union Trust Company), and to foreclose the mortgage or deed of trust executed to secure the payment thereof according to the terms of said bonds and mortgage or deed of trust. Prior to the institution of said suit, in an action instituted by E. C. Wallace against the railway company, R. V. Miller was appointed and duly qualified as the receiver of the said railway company. In said foreclosure suit numerous parties were made de-

fendants, among whom were said R. V. Miller, receiver, St. Louis Union Trust Company, of St. Louis, Mo., as trustee, National Bank of Commerce of Kansas City, Mo., Farmers' & Merchants' Bank and American National Bank, each of Sapulpa, Okla., E. C. Wallace, General Electric Company of Schenectady, N. Y., and S. E. Carter of Webb City, Mo.

On August 7, 1913, the defendant, S. E. Carter, filed in said suit his answer and cross-petition, in which it was admitted that the lien of the Fidelity Trust Company, as trustee, under the bond issue of February 1, 1908, constituted a first and prior lien on the property of the Sapulpa & Interurban Railway Company, covered by said mortgage; but this answer did not admit that said mortgage or deed of trust covered all of the property described in plaintiff's petition, and said defendant asked that the amount and character of the property included in said first mortgage be by the court adjudicated and determined. The answer charged that on the 7th day of July, 1910, said defendant loaned to the Sapulpa & Interurban Railway Company $25,000, for which said company executed to him its promissory notes, one in the sum of $10,000, and a second for $15,000, each maturing 12 months after date. That prior to and at the time of the execution of said notes, the said railway company, through its officers and board of directors, represented to said defendant that it was the intention of said railway company to issue bonds aggregating $2,000,000, to be secured by a mortgage upon the railroad property; and that it was the purpose of said company to make use of certain of said bonds forthwith, in order to raise funds with which to continue the work of extension and development of its line of railway, and that it was necessary for said railway

company to have at that time the sum of $25,000, in order to carry on its contemplated work. That a portion of said bonds, at a valuation of 70 cents on the dollar, would be delivered to and placed with said defendant as soon as the same could be prepared and issued, as collateral security for said loan. That as a guaranty of good faith on the part of the railway company, there was at the time delivered to said defendant a certified copy of certain resolutions passed at a specially called meeting of the board of directors of said company on July 7, 1910, by the terms of which the directors of said railway company authorized the executive committee thereof to arrange, settle, and determine all matters concerning the issuance of bonds in the sum of $2,000,000; to execute the necessary mortgage or deed of trust; to select a trustee, and to determine all other matters in connection with the issuance of said bonds. That pursuant to said agreement, and to the authorization of the said resolutions, and for the purpose of providing funds for extension and improvement work, negotiations to that end were begun with the St. Louis Union Trust Company, with the result that on April 1, 1911, said railway company executed a mortgage or deed of trust to the said St. Louis Union Trust Company, as trustee, which was on the 7th day of April, following, duly executed by the said trust company, and filed for record on June 27, 1911, in the office of register of deeds of Creek county. That said deed of trust was given to secure the payment of $2,000,000, 5 per cent. bonds of said company, and included and conveyed to the trustee all and singular the property and line or lines of railroad of the railway company, of whatsoever description, including all extensions of its main line, and branch or auxiliary lines pertaining thereto,

then owned by or thereafter to be by it acquired. That said mortgage provided in detail for the execution, certification, and registration of the bonds, and for the issuance, appropriation, and application of the same; and included in article 2, section 1, a provision that of the total aggregate of $2,000,000 face value of bonds to be certified under, and the payment of which was secured by, or was intended to be secured by, said indenture, there should be certified and delivered by the trustee forthwith to the mortgagor, or upon its written order, under its corporate seal, first mortgage bonds to the amount of $275,000 principal, in respect of the 10.86 miles of main line of railroad then owned by the mortgagor. That in accordance with the terms and conditions of said mortgage, $275,000 of first mortgage bonds were properly executed by the officers of said railway company and thereafter forwarded to the St. Louis Union Trust Company, with instructions to certify the same. The plea of intervention further charges that all of the preliminary requirements provided for in said mortgage or deed of trust were fully complied with, and that said mortgagor was entitled to have the trustee certify to said bonds, and deliver the same to the mortgagor, or its order, as provided for by said mortgage, but that the trustee, St. Louis Union Trust Company, wrongfully failed and refused to so certify, as requested by the mortgagor, and had, up until the date of answer, failed and refused to certify to the same.

Prior to the issuance of said mortgage, it appears that on Ocober 24, 1910, said railway company delivered to said defendant an interim certificate, under the seal of the corporation, in which it was acknowledged that the railway company had obligated itself to deliver as

collateral security for defendant's loan the bonds of the company as soon as issued and ready for delivery, at a valuation of 70 cents on the dollar. At about the same time the railway company addressed an order to the trust company at St. Louis, inclosing the interim certificate, and directing it, as trustee, to deliver to Carter bonds at the valuation heretofore named, as collateral to the $25,000 loan owing by the railway company, and further directing that in the event of the sale of the bonds, or of the trustee making a loan thereon, said trustee was to pay the principal debt and interest owing by the railway company to Carter. It was charged that as a result of the transactions had between said defendant and the railway company, the former was in equity entitled to and had a lien upon all of the property of the railway company described in its mortgage to the St. Louis Union Trust Company, subject only to the claim of the Fidelity Trust Company, trustee under the original bond issue, and of the state and county for taxes. That as to other lien claimants, defendant's equitable lien should be given priority, all other claims, it was said, having been contracted subsequent to the date of the filing of the second deed of trust. No answer to the defendant's cross-petition was ever filed by the defendant railway company. October 7th following, the defendant General Electric Company filed its answer, denying generally the allegations of said cross-petition. October 14th, although it does not appear to have theretofore been a party to the suit, the State of Oklahoma on the relation of J. D. Lankford, Bank Commissioner, filed an answer, denying generally the allegations of defendant's cross-petition. October 25th the plaintiff filed its reply, denying generally the allegations in the answers of all answering defendants. October 27th,

the defendant St. Louis Union Trust Company filed its answer, admitting the execution of the deed of April 1, 1911, made by the railway company, but denying that any of the bonds, the payment of which was or was purported to be secured by said deed of trust, had ever been certified by its trustee.

On the trial of the defendant's claim, October 30th, Birch C. Burnett and Bates B. Burnett each testified as witnesses in defendant's behalf. The former was treasurer, the latter president, of the Sapulpa & Interurban Railway Company, both at the time of making the Carter loan and of the execution of the second deed of trust. The testimony of these witnesses, as well as that of W. B. Kane, cashier of the First National Bank of Carterville, Mo., who accompanied Mr. Carter to Sapulpa at the time the loan was made, and that of defendant Carter fully sustain the allegations of defendant's answer, as to the inducements offered and representations made to Carter at the time the loan was made. George G. Chase, assistant trust officer of the St. Louis Union Trust Company (said to be the owner of the bonds originally issued), also testified as a witness for defendant; his testimony, as to the execution of the second deed of trust, being in accord with that of the officers of the railway company. As a reason for said trust company's failure to certify the $275,000 in bonds, the witness testified he could not certify to the latter issue as being first mortgage bonds of the railway company, without the prior mortgage being released and the bonds canceled. In the documentary evidence introduced at the trial were the resolutions of July 7, 1910, authorizing the Carter loan of that date, in reliance upon the terms of which, all of the testimony shows, the Carter loan was made.

These resolutions authorized the negotiation of the particular loan, the execution of the company's note therefor, and provided that of the bonds to be issued, a portion thereof, at a valuation of 70 cents, should be used by the treasurer of the railway company to secure the loan authorized. The resolutions further provided that all bonds issued pursuant thereto should be secured by a deed of trust upon the assets of the company. As already seen, the undisputed evidence of all parties to the transaction was to the effect that bonds, secured by a mortgage on the property of the railway company, should be delivered to Carter as collateral security for the loan, and that but for such undertaking and agreement on the part of the railway company, the loan would not have been made. It was shown that the money borrowed was used by the railway company in the extension and improvement of its line of railway. That the officers of the railway company did everything that lay in their power to carry out and perform the terms of the company's agreement with Carter, except to pay off the outstanding $50,-000 bond issue, is abundantly shown, in fact, is undenied. It was no part of the agreement of the officers of the railway company that Carter's security should be dependent upon the payment of the outstanding bonds, or the certification by the trustee of the bonds of the second issue. The agreement and intention of the parties, in effect, was to secure the loan by a mortgage or deed of trust on the property of the railway company. That such was the purpose of the parties there can be no reasonable doubt. Notwithstanding the evidence offered by the defendant, the court, failing, doubtless, to appreciate the consequences of such an agreement, found that upon the pleadings, and from the evidence, Carter was not entitled

to a lien upon the property of the railway company. In this it is urged that the court erred.

The only contest against the allowance of defendant's claims, appearing from the record, is urged by the State of Oklahoma and the General Electric Company. The state, in the trial court, sought to recover judgment against the railway company in the sum of $117,619.11, together with interest and attorney's fees, on account of transactions arising out of the failure of the Farmers' & Merchants' Bank, and the Oklahoma State Bank of Sapulpa; while the General Electric Company sought a recovery against the railway company in the sum of $32,-853.07, and asserted a lien upon the property of said company. It is a rule widely recognized, that by an express executory agreement in writing, whereby a contracting party sufficiently indicates an intention to make some particular property or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, there is created an equitable lien upon the property so indicated, which is enforceable against the property, in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or incumbrancers with notice. The foregoing statement of the rule is found in Pomeroy's Equity Jurisprudence (3d Ed.) section 1235, where many authorities, some of which cite the text, are to be found. The doctrine is an application of the maxim, Equity regards as done that which ought to have been done. In *Walker et al. v. Brown, Adm'x*, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865, Mr. Justice White, in delivering the opinion of the court, after quoting in full the foregoing paragraph from Pomeroy's Equity

Jurisprudence, in addressing himself to the case before the court, said:

"Before considering the contract itself, and the issue of fact which arises, it is necessary to fix the legal principles by which the question of equitable lien is to be determined. It is clear that if the express intention of the parties was to create an equitable lien upon the bonds or the value thereof, or if such intention arises by a necessary implication from the terms of the agreement construed with reference to the situation of the parties at the time of the contract, and by the attendant circumstances, such equitable lien will be enforced by a court of equity against the bonds in the hands of Brown or against third persons who are volunteers, or have notice."

So, in Story's Equity Jurisprudence, section 1231, it is said there is generally no difficulty in equity in establishing a lien, not only on real estate, and on personal property, but on money in the hands of a third person, wherever that is a matter of agreement, at least against the party himself, and other persons who are volunteers, or who have notice.

In *Ketchum et al. v. St. Louis,* 101 U. S. 306, 25 L. Ed. 999, it is held that a party may by express agreement create a charge or claim in the nature of a lien on real as well as on personal property, of which he is the owner or in possession, and equity will establish and enforce such charge or claim, not only against the party who stipulated to give it, but also against third persons who are either volunteers, or who take the estate on which the lien is agreed to be given, with notice of the stipulation; that such agreement raises a trust which binds the estate to which it relates, and all who take title thereto with notice of such trust can be compelled in equity to fulfill it.

49—16

The rule is announced in Jones on Mortgages, sections 162, 163, that an agreement to give a mortgage or security on certain property, not objectionable for want of consideration, is treated in equity as a mortgage, upon the principle that equity will treat that as done which by agreement is to be done. And that the meaning of the maxim, that equity looks upon things agreed to be done as actually performed, is that equity will treat the matter, as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties had been executed as they ought to have been done. Referring again to Pomeroy's Equity Jurisprudence, in section 1237 it is said that an agreement to give a mortgage creates a lien, that the intent to give a security being clear, equity will treat the instrument as an executory agreement for such security. The rule governing the effect and incidents of equitable mortgages, as laid down in 27 Cyc. 976, is:

"Generally whenever a transaction resolves itself into a security or an offer or attempt to pledge land as security for a debt or liability, equity will treat it as a mortgage, without regard to the form it may assume."

It is further said that an equitable mortgage can only arise from a specific agreement between the parties in interest, and that there must be clear and unequivocal proof of the intent to create the mortgage, and of the sum which it was made to secure. While at page 983, it is said:

"On the well-settled doctrine that a court of equity will regard that as done which ought to have been done, it is held that a contract or agreement whereby a party promises in the future to execute and give a mortgage on specific property, if it is unambiguous and founded on a sufficient consideration, and indentifies the property to

be charged with due certainty, will be treated in equity as equivalent to the creation of the mortgage itself, and will be enforced as a specific lien on the property described."

An equitable mortgage may be constituted by any writing from which the intention to do so may be gathered. As said in section 1237, Pomeroy's Equity Jurisprudence:

"The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose rather than at the form: and if the intent appear to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows."

By Judge Story it was said, in *Flagg v. Mann et al.*, 2 Sumn. 486, 533, Fed. Cas. No. 4847, that if the transaction resolve itself into a security, whatever may be its form, it is in equity a mortgage. In the case at bar the written evidence of the intention to execute and deliver bonds secured by a mortgage was first in the form of a certified copy of the resolutions of the board of directors of the railway company, delivered to Carter prior to the making of the loan, and afterwards, by the interim certificate and the order addressed to the trustee. Not only did the resolutions authorize the issuance and delivery of the bonds which were to be secured by mortgage, but subsequent thereto, and in pursuance thereof, the mortgage was executed both by the railway company and the trustee, and bonds in the sum of $275,000 were duly executed by the railway company and forwarded to the trustee for certification. That the bonds were in fact never certified does not in equity affect defendant's right to an equitable lien; it is not the bonds, as such, upon

which the lien is asserted, but the agreement to secure the indebtedness by a mortgage upon the property of the railway company. In other words, it was the agreement to secure, not by the bonds alone, but by a mortgage upon the corporate assets of the railway company. While the written evidences of the agreement are somewhat out of the ordinary, they are sufficient, not considering the fact of part performance on the part of defendant. A somewhat similar question was before the court in *Miller v. Rutland & W. R. Co.*, 36 Vt. 452, where it was said, in answer to the claim that the writings were not sufficient in view of the statute of frauds:

"Waiving any discussion of the question as to the effect of the delivery, and receipt, and use of rails, and the delivery of the bonds in payment, under the contract that they were to be secured by a mortgage, we regard the action of the directors, by their formal and recorded votes, as tantamount to a memorandum in writing sufficient to answer the requirements of the statute. It constitutes evidence of the highest character, as against the corporation, of the agreement to give the designed security."

There being no question as to the intention of the parties to create a lien, the failure of the trust company to certify the bonds will not be allowed to defeat the agreement of the parties. Between the parties to be affected, the agreement was complete, and capable of enforcement in equity.

The action of the board of directors of the railway company, had on March 28, 1911, in which its former action of July 7, 1910, was rescinded and annulled, would not serve to defeat or impair the rights of creditors of the company that had already attached. The loan from Carter to the company having been made in reliance upon

the formal action of the board of directors and of their agreement, the equitable lien that attached in his favor was dependent upon something more stable than the pleasure of the officers of the railway company though we may well doubt that it was their purpose to deprive defendant of security.

In the trial court, no account was taken of the property covered by the mortgage of February 1, 1908. Upon what part of the property of the railway company defendant's lien attached, or whether in fact other mortgages, intended as additional security, were executed by the railway company to the Fidelity Trust Company, and the effect thereof, are questions that can only be determined upon a trial in the court below. The same may be said of the relative rights of the different defendants and interveners.

The judgment of the trial court is reversed, and the cause remanded, with instructions to proceed in conformity with the views herein expressed.

All the Justices concur.