## KETCHUM *v.* ST. LOUIS.

1. The act of the General Assembly of Missouri, approved Jan. 7, 1865, under which the county of St. Louis loaned its bonds to the extent of $700,000, to the Pacific Railroad Company created, on its acceptance by the company and the county, an equitable lien or charge, in favor of the county, upon the earnings of the road, to the extent necessary to meet the interest upon the bonds as it accrues. The lien continues until the bonds shall be paid.

2. All purchasers of the property of the company, or of its bonds issued under a mortgage subsequently executed, are bound to take notice of that act. Where, in a suit to foreclose such a mortgage, the road is placed under the charge of a receiver, the lien or charge in favor of the county is enforceable not only against the fund in his hands, but against the purchaser under the decree, and against whomsoever may hold the road or have the custody of its earnings.

3. Where a debtor, by an agreement with a creditor, sets apart a fixed portion of a specific fund in the hands, or to come into the hands, of another person, whom he directs to pay it to the creditor, the agreement is, when assented to by such person, an appropriation, binding upon the parties and all who, having notice, subsequently claim under the debtor an interest in the fund.

4. A party may, by agreement, create a charge or claim in the nature of a lien on real as well as on personal property whereof he is the owner or in possession, which a court of equity will enforce against him, and volunteers or claimants under him with notice of the agreement.

APPEAL from the Circuit Court of the United States for the Eastern District of Missouri.

The facts are stated in the opinion of the court.

*Mr. Melville C. Day* and *Mr. James O. Broadhead* for the appellants.

*Mr. Philip Phillips, Mr. Henry A. Clover, Mr. Britton A. Hill,* and *Mr. Frank J. Bowman, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

The present appeal brings before us for examination a decree of the Circuit Court rendered April 25, 1877, adjudging that the county of St. Louis had an equitable lien or charge upon the earnings of the Pacific Railroad of Missouri, to whomsoever the same may be transferred or conveyed, prior and paramount to any mortgage or other lien thereon, to the extent of $4,000 per month, payable monthly, from the first day of April, 1876, and $1,000 payable in each month of December, to meet the interest upon $700,000 of bonds issued by the county of St. Louis in the year 1875, and by it loaned to the Pacific Railroad Company, such payments to continue until the bonds are fully paid by the company.

The decree declared the lien to exist, and to be enforceable on the railroad property and franchises, against the funds in the hands of the receiver in this suit as well as the purchaser under the mortgage foreclosure sale to be hereafter referred to.

The learned judge who heard this cause in the Circuit Court rested the decree upon the proposition of law that " if a debtor by a concluded agreement with a creditor sets apart a specific amount of a specific fund in the hands, or to come into the hands, of another from a designated source, and directs such person to pay it to the creditor, which he assents to do, this is a specific appropriation binding upon the parties and upon all persons with notice who subsequently claim an interest in the fund under the debtor."

Was there an agreement of the character indicated in this statement?

That is the first question to which we shall direct our attention.

The Pacific Railroad Company was incorporated by the legislature of Missouri in the year 1849, with power to construct a line of railway from St. Louis to Kansas City, a dis-

tance of nearly three hundred miles. For the purpose of aiding in the construction of the road, the State from time to time loaned its bonds to the company. They amounted in the year 1855 to more than $7,000,000, and were secured by a first mortgage upon the property, franchises, and income of the company, with power of sale upon default in meeting the interest and principal of the bonds. Less than two hundred miles of the road was completed at the beginning of the recent civil war, and during its continuance but little progress was made in the work of construction.

By an act approved Feb. 10, 1864, the company was authorized to borrow money " for the completion of the main road to Kansas City," and, for that purpose, to issue its bonds to the amount of $1,500,000, " to be secured by a first mortgage on the main line of the road west of Dresden," — so much of the bonds as were necessary to be applied to the completion of the road from its then terminus to Kansas City, and to no other purpose. For that object, and to that amount and extent only, the State, by the express words of the act, relinquished her first mortgage lien and right of forfeiture upon the road west of Dresden, retaining, however, a second lien and mortgage thereon, — such second lien and mortgage to become forthwith, upon the payment in full of the principal and interest of the bonds authorized by that act, the first lien and mortgage, in every respect and as fully as those held by the State.

The act created the office of fund commissioner, to be filled by appointment of the governor, subject to confirmation by the Senate. It declared that such office should " continue until the bonds issued for the completion of the road, and the State bonds loaned to said railroad company, with interest thereon, are fully paid out of the earnings, or exchanged for the first-mortgage bonds of said road," as thereinafter provided. The fund commissioner became entitled, and it was made his duty, to take possession of the $1,500,000 of bonds authorized to be issued, negotiate the same, and their proceeds, together with the gross earnings of the road, from whatever source, to control and apply as directed in the act.

Without referring to other provisions of the act, it is sufficient to say that the State, through the fund commissioner, acquired,

for its security, complete control of the earnings and income arising from the property.

Following the course of events in the history of this railroad, we find that in September, 1864, the State of Missouri was invaded by insurrectionary forces, which destroyed much of the property belonging to the company, including bridges, depots, machine-shops, and track. The cost of repairing the injury thus done and of completing and putting the road in successful operation was estimated by the board of directors at the sum of $700,000. These facts were communicated to the county court of St. Louis County by a committee of the board, in a memorial, stating: "This sum we have lost as the result of the invasion. This amount we want the county to provide by issuing to the company the bonds of the county (under authority to be given by the legislature), bearing seven per cent interest, the same to be a *loan* to complete the road, the company to refund to the county the principal and interest as the same matures."

The memorial concluded in these words: "If completed, we believe that the *earnings* of the road will soon furnish all the equipments required for the increased business, pay off the $1,500,000 mortgage, provide for the payment of the county bonds now asked for, and in six or seven years commence paying on the bonds issued by the State for our benefit. But should the financial success of the enterprise not equal our expectations, the importance of the road as a great artery of trade and commerce will justify the expenditure asked for."

The justices composing the county court seem to have concurred in the propriety of the loan, but differed as to the conditions upon which it should be made. One of their number presented for adoption an order reciting the conditions which, in his judgment, should be embodied in any law authorizing bonds to be issued, viz. that the State should relinquish so much of its mortgage upon the road as covered the rolling-stock, which should then be mortgaged by the company to the county as security for the $700,000 of bonds to be issued; that the company should pay into the county treasury, at least thirty days prior to the maturity of the interest, the full amount thereof, in default of which the whole debt should become due, with power in the county to foreclose the mortgage; and, finally,

that the proposed act should be submitted for acceptance or rejection to the actual tax-payers of the county.

Another member of the county court offered as a substitute the draft of an order embodying, among other things, an act to be submitted to the legislature authorizing the proposed issue of bonds. This substitute declared that, in view of the importance of the completion of the road to the tax-payers of the county, the court would concur (in case application should be made by the company) in the propriety of the passage of an act " securing the completion of said road and the interest of the county of St. Louis in the said bonds." The proposed act contained this provision : —

" Said bonds to be issued under such conditions as may be agreed upon between said county court and the board of directors of the Pacific Railroad; and the fund commissioner of the Pacific Railroad Company shall pay every month $4,000, and $1,000 additional each month of December, to the treasurer of St. Louis County, to meet the interest on the above seven hundred bonds; said payments to continue until said bonds are paid by the Pacific Railroad Company."

The substitute was adopted by the county court, and, being submitted to the legislature of Missouri, that body, on the 7th of January, 1865, passed an act containing additional provisions. It is here given at length, since the case depends mainly, if not altogether, upon the construction which may be given to its provisions : —

" SECT. 1. The county court of St. Louis County is hereby authorized to issue seven hundred county bonds of the denomination of $1,000 each, having twenty years to run, and bearing interest at the rate of seven per cent per annum, payable semi-annually, the principal and interest payable in the city of New York, and loan said bonds to the Pacific Railroad Company for the completion of said road; said bonds to be issued under such conditions as may be agreed upon between said county court and the board of directors of the Pacific Railroad Company, such conditions to be binding on the parties, but shall not impair or affect the validity of the bonds after they are issued.

" SECT. 2. The fund commissioner of the Pacific Railroad, or such person as may at any time hereafter have the custody of the funds

of said railroad company, shall, every month after said bonds are issued, pay into the county treasury of St. Louis County, out of the earnings of said Pacific Railroad, $4,000, and $1,000 additional in each month of December, to meet the interest on the said seven hundred bonds; said payments to continue until said bonds are paid off by the Pacific Railroad.

"This act to take effect and be in force from and after its passage."

This act was accepted by the railroad company. It expressly agreed to comply with all its provisions. In conformity therewith bonds were issued by the county and delivered to the railroad company as follows: One hundred bonds on 20th February, 1875, two hundred bonds on 7th March, 1875, and four hundred bonds on 5th May, 1875. They were sold by the company, and the proceeds applied in the completion of the road to Kansas City.

On 15th of July, 1868, the company executed a first mortgage on its franchises and property for $7,000,000; on 1st of July, 1871, a second mortgage for $3,000,000; and on 10th July, 1875, a third mortgage for $4,000,000, — the latter being the same mortgage which was foreclosed by decree rendered on 6th June, 1876, in *Pacific Railroad* v. *Ketchum, supra,* p. 289. The decree of foreclosure and sale in that case was passed in the Circuit Court, and has been affirmed here, at the present term, but without prejudice to the lien claim of St. Louis County.

In view of these and other facts to be presently detailed, it is difficult to believe that the officers of the company had any expectation whatever that the county would make a *loan* of $700,000, without security of some sort, and upon the bare promise or covenant of a railroad corporation, staggering under an enormous indebtedness and without credit, that it would meet the interest upon the loan. We have seen that the committee appointed by the company to seek financial aid from the county expressed, officially, the belief that upon the completion of the road its *earnings* would soon furnish all the equipments required for increased business, pay off the $1,500,000 mortgage, *provide for the payment of the county bonds then asked for,* and in six or seven years thereafter commence paying on the bonds issued by the State for the benefit of the company. But

more significant as to the intention of the company and as to the impression which it sought to produce upon the county court is the fact that, immediately upon the passage of the act, the president of the railroad company, with a view, of course, to influence the action of the county court, presented to that body the written opinion of its counsel, prepared with unusual care, in which he declared: 1. That if the act should be accepted by the company, and the county should make the loan authorized, the act would be binding upon all the parties, in favor of the county court, to wit, the company, the fund commissioner, and the State.   2. That an agreement executed by the company expressing its assent to such appropriation of the earnings of the road would create in favor of the county an equitable lien or charge upon the earnings, *pro tanto.*   3. That the direct authorization of such appropriation of the earnings, or rather the direction to the fund commissioner (the trustee) to pay this monthly appropriation out of funds, to the benefit of which it (the State) was entitled, was unquestionably a waiver or postponement of the interest of the State, *cestui que trust,* in favor of the county, to the extent and for the purpose specified in the act.

" The act," said counsel, " admits of no other construction." That opinion was filed and preserved by the clerk of the county court among its records.

If the railroad company deemed it possible that the county would make a loan of $700,000 upon the simple promise of the corporation to save it harmless, — if they had not believed that the county court would exact ample security for the protection of its constituents against liability, it would scarcely have been suggested through counsel that the acceptance of the act of Jan. 7, 1865, would amount to a specific *appropriation* of so much of the earnings as would suffice to meet the interest until the bonds were paid off.

We next inquire whether any different belief was indulged by the county court.   Did its members intend the loan- to be made without securing the county in some effectual mode? These questions must, in view of all the circumstances, be answered in the negative.   We have seen that, when the original application was made to the county court, one of the justices

submitted a proposition requiring the company to secure the loan by a mortgage upon the rolling-stock, the State to that extent surrendering its mortgage or lien. The substitute which was adopted described the act which it was proposed to submit to the legislature as an act " *securing* the completion of the road and the *interest* of the county of St. Louis in the issue of said bonds." The security which the proposed act provided was a direction to the fund commissioner to pay the amount necessary to meet the interest, and to continue such payments until the bonds were paid by the company. It is quite clear that a proposition to make this loan, without providing some security against liability. would not have been entertained by the county court.

As to the State, it is abundantly clear, from the language of the act of 1865, without reference to the circumstances under which it was passed, that the legislature, as an inducement to the county of St. Louis to come forward and save an important enterprise, in which the State was largely interested financially, intended to waive the prior statutory lien of the State to the extent necessary to secure the prompt liquidation of the interest on the proposed loan, during the whole period the bonds were outstanding and unpaid. The State, at that time, had control of the entire earnings of the railroad, and if the legislature did not intend to forego any priority or advantage then enjoyed by the State, but designed only to give authority to the county to issue its bonds, that purpose could have been accomplished by the first section of the act of 1865, leaving the county and the railroad company to make such terms and conditions as suited them.

The second section of the act shows, beyond question, that the purpose of the legislature was not so restricted, — that its intention was to provide full security to the county in the event the county court exercised the authority given by the act. The draft of the statute submitted by the county court to the legislature contained only a general direction to the fund commissioner to pay the interest, and to continue such payments until the bonds were paid off by the company. But so fixed was the legislature in the purpose to protect the county, that it extended that direction to " such person as may at any time hereafter

have the custody of the funds of the company," and, by express words, required the payments of interest, whether by the fund commissioner or by such other person, to be made " out of the earnings of said Pacific Railroad." The object of these additions to the act, as submitted by the parties, cannot be mistaken. The office of fund commissioner was created by statute, and, consequently, its continuance depended upon the will of the legislature. To meet the contingency of the abolition of that office, the same duty was imposed upon such *person* as *at any time thereafter* should have the *custody of the funds of the company.* And that there might be no misapprehension as to the source from which funds to meet the interest were to be derived, the legislature, in effect, gave the assurance that the *earnings* of the railroad, by whomsoever held, should supply the amount necessary to that end.

In this connection we may notice another important difference between the act in the form in which it was submitted to the legislature and that in which it finally passed. The former provided that the bonds should be issued "under such conditions as may be agreed upon between said county court and the board of directors of the Pacific Railroad." But the legislature added the words, " such conditions to be binding on the parties, but shall not impair or affect the validity of the bonds after they are issued." These last words, but for the succeeding section of the act, would have placed the county at the mercy of the railroad company, and rendered it liable to holders of bonds, whether the company complied or not with the conditions upon which the loan was made. It is manifest that while the legislature intended, by the language last quoted, to facilitate the sale of the bonds, and thereby secure the early completion of the road, it intended also by the second section of the act to assure the county of St. Louis that its absolute liability to holders of its bonds was largely nominal, since, by that section, out of the *earnings* of the property, to the extent necessary, and whether the funds of the company were in the custody of the fund commissioner or of some other person, the interest on the bonds should be paid at maturity, and such payments continued until the bonds were paid.

That the legislature intended by the act of 1865 to make a

specific *appropriation* of the earnings for that purpose; that the prior lien of the State was, to that extent, waived in favor of the county; and that such appropriation and waiver were, by agreement of all the parties then interested in the property and the disposition of its income, to continue until the bonds themselves were paid or the county discharged from liability thereon, we entertain no doubt. It was not a simple, naked covenant to pay out of a particular fund; but the act, being accepted by the parties interested, operated as an equitable assignment of a fixed portion of that fund, — an assignment which became effectual without any further intervention upon the part of the debtor, and which the party holding the funds of the company, whether the fund commissioner or some other person, could respect without liability to the debtor for so doing. It was an arrangement, based upon a valuable consideration, which neither the State nor the company, nor both, nor parties claiming under either, with notice, could disregard without the assent of the county, expressed by those who had authority to bind it. It was an engagement to pay out of a specially designated fund, accompanied by express authority to its custodian to apply a specific part thereof to a definite object, in the accomplishment of which all the parties to the arrangement were directly interested. To construe the act otherwise will not only do violence to plain words, requiring no construction, but convict the legislature of a deliberate design to entrap the county of St. Louis into incurring an enormous debt primarily for the benefit of the State, which controlled the earnings of the property for its own benefit.

It remains to inquire whether this agreement or arrangement can be carried into effect consistently with the settled principles of equity.

We remark that all parties claiming under mortgages executed by the company after the acceptance of the act of 1865 (none others are interested in the determination of this case) are chargeable with notice of the appropriation of earnings made by that act. "In this country," says Mr. Sedgwick, "the disposition has been, on the whole, to enlarge the limits of the class of public acts, and to bring within it all enactments of a general character, or which in any way affect the community

at large." Sedgwick, Stat. and Const. Law., p. 25. That act related to matters in which the general public were concerned, and all were bound to take notice of its provisions.

We are of opinion that no insuperable obstacle exists in the way of a court of equity giving effect to this agreement or contract between the parties as against those whom the law charges with notice thereof. The relief granted by the decree seems to be in accordance with established rules in such cases.

In *Legard* v. *Hodges*, Lord Thurlow said: "I take this to be a universal maxim, that wherever persons agree concerning any particular subject, that, in a court of equity, as against the party himself, and any claiming under him voluntarily, or with notice, raised a trust. These persons have so claimed; and, therefore, this is a pure trust estate," and they must be declared trustees. 1 Ves. Jr. 478. In the report of that case in 3 Bro. C. C. 531, the Chancellor says: "I take the doctrine to be true, that when parties come to an agreement as to the produce of land, the land itself will be affected by the agreement." Upon rehearing, the former decree was affirmed. 4 id. 422.

*In Re Strand Music Hall Company* (3 De G., J. & S. 147), the question arose whether that company had created a valid charge on their real property. "There can, I think," said Lord Justice Turner, "be no doubt that it was intended by these agreements to create a charge upon the property of the company, but it was said on the part of the official liquidator that this intention was not well carried into effect. I apprehend, however, that where this court is satisfied that it was intended to create a charge, and that the parties who intended to create it had the power to do so, it will give effect to the intention, notwithstanding any mistake which may have occurred in the attempt to effect it."

The doctrine is thus stated by Mr. Justice Story in his Equity Jurisprudence, vol. ii. sect. 1231: "Indeed, there is generally no difficulty in equity in establishing a lien, not only on real estate, but on personal property, or on money in the hands of a third person, wherever that is a matter of agreement, at least against the party himself, and third persons who are volunteers

or have notice; for it is a general principle in equity that as against the party himself, and any claiming under him voluntarily or with notice, such an agreement raises a trust." The author cites, in support of these views, *Legard* v. *Hodges, supra.*

So, also, in *Pinch* v. *Anthony and others*, 8 Allen (Mass.), 536. " It is well stated that a party may, by express agreement, create a charge or claim in the nature of a lien on real as well as on personal property of which he is the owner or in possession, and that equity will establish and enforce such charge or claim, not only against the party who stipulated to give it, but also against third persons who are either volunteers, or who take the estate on which the lien is agreed to be given, with notice of the stipulation. Such agreement raises a trust which binds the estate to which it relates, and all who take title thereto with notice of such trust can be compelled in equity to fulfil it."

In the recent work of Mr. Jones on Mortgages (vol. i. sect. 162) the author remarks: " In addition to these formal instruments which are properly entitled to the designation of mortgages, deeds, and contracts, which are wanting in one or both of these characteristics of a common-law mortgage, are often used by parties for the purpose of pledging real property, or some interest in it, as security for a debt or obligation, and with the intention that they shall have effect as mortgages. Equity comes to the aid of the parties in such cases, and gives effect to their intentions. Mortgages of this kind are therefore called equitable mortgages." So, also, in his treatise on Railroad Securities, p. 57, the same author says: " An agreement of a company to set apart specific earnings or property in the hands of a third person to meet the interest or principal of its bonds, creates an equitable lien or charge." Willard, Eq. Jur. 462; *Watson* v. *The Duke of Wellington*, 1 Russ. & Myl. 602; *Yeates* v. *Groves*, 1 Ves. Jr. 279; *Lett* v. *Morris*, 4 Sim. 602; *Ex parte Alderson*, 1 Madd. 39.

Further citation of authority would seem to be unnecessary. If any doubt exists as to the case coming within these recognized principles of equity, it is sufficient to say that the appropriation of the earnings of the railroad company as security for

the loan by the county was in pursuance of a special act of the legislature; and in sustaining the decree below we give effect to the legislative will as to matters over which its authority unquestionably extended.

It will be observed that we have made no allusion to the act of March 30, 1868, subsequently to the passage of which the first, second, and third mortgages were executed. In behalf of the plaintiffs in error, it is contended that the act of 1868 shows the construction given by the Circuit Court to the act of 1865 to be inadmissible. The answer to this proposition is twofold: 1st, The act of March 30, 1868, furnishes, upon its face, evidence to all that the State felt itself under obligation to provide for the security of the county on account of the loan made to the railroad company, under the authority of the act of Jan. 7, 1865. 2d, Be that as it may, if, as we have held, the act of 1865, and its acceptance by the parties, constituted a contract by which the State waived its lien, in favor of St. Louis County, to the extent and for the purpose therein indicated, and by which the State, the railroad company, and the county appropriated the company's earnings to the payment of the interest on the county's bonds, such payments to continue until the bonds were paid off by the company, no subsequent legislation could deprive the county of the security thus acquired. Nor could parties, who claim under subsequent incumbrances, and who are chargeable with notice of the appropriation made by the act of 1865, destroy the equitable lien of the county, even with the consent of the railroad company. With that lien the property itself was chargeable by whomsoever it or the funds accruing therefrom are or may be held.

By an order heretofore made in this court, the city of St. Louis was allowed to intervene in this cause for the purpose of protecting such interest as it may have herein, and for the purpose of being heard at the argument. The claim of the city is, that, by the Constitution and laws of Missouri, it has assumed the position formerly occupied by the county of St. Louis under the act of Jan. 7, 1865, — that the instalments of money required by the act to be paid monthly into the county treasury are due and payable to the city treasury, and that it

has been subrogated to the rights and liabilities of the county as to all matters arising out of the issue of the bonds in question.

Since the making of that order, a written stipulation has been filed in this court signed by all the parties to the record, including the city, agreeing that in the event the decree below is affirmed, the city of St. Louis shall be substituted therein in lieu and place of the county of St. Louis. The stipulation will be entered at large upon the record, and an order entered substituting the city to all the rights acquired by the county in virtue of the decree below.

We deem it unnecessary to allude to any other points discussed by counsel. We have noticed all deemed by us material. What has been said is sufficient to dispose of the cause upon its merits.

Perceiving no error in the decree, it is, in all respects,

*Affirmed.*

MR. JUSTICE STRONG and MR. JUSTICE BRADLEY dissented.

MR. JUSTICE STRONG. I cannot concur in the judgment given in this case. I am unable to discover in the contract between the company and the county, or in the act of the legislature, or in both, any thing that created an equitable lien upon the earnings of the railroad company, or upon any of its property. Nothing more is expressed than a confident expectation that the earnings would prove sufficient to pay the interest on the county loan.