returned the judgment will be upheld. English v. State, 29 Tex. App. 174, 15 S. W. 649; Boren v. State, 23 Tex. App. 28, 4 S. W. 463; Southern v. State, 34 Tex. Cr. R. 144, 29 S. W. 780, 53 Am. St. Rep. 702; Isaacs v. State, 36 Tex. Cr. R. 505, 38 S. W. 40; Davidson v. State, 86 Tex. Cr. R. 243, 216 S. W. 624.

There are no bills of exception in the record to the rejection or reception of any evidence. Appellant excepted in rather general terms to various parts of the charge because same did not correctly define "force," was not a correct application of the law to the facts, was confusing in that it submitted both characters of rape in the same paragraph of the court's charge, etc.

[2] Under the evidence in this case the court might well have omitted any reference to rape by force, but inasmuch as there was but one transaction involved, and it appears without contradiction or dispute that prosecutrix was under 18 years of age, and that in such case carnal knowledge alone would suffice to sustain the charge, we are unable to see any possible injury to appellant growing out of any of the matters complained of in the charge. The girl testified positively to the fact of intercourse, and, while the evidence tends to support her claim that she did not consent thereto, the circumstances are such as that the jury may have concluded that same was with her consent. It was also without dispute that as soon as she got home from the trip on which she claimed appellant raped her she reported the matter to her father and mother, and was greatly distressed and crying. They sent for a physician, who examined her and testified that there was a rupture in her hymen that looked to be a recent one and that there was a small clot of blood. He said that the condition was one which could have been produced by carnal connection with a male person.

If the jury believed there was carnal knowledge of prosecuting witness at all—and this matter was clearly presented in the charge of the court—and they did not accept appellant's denial of any intercourse whatever, they could not have done less than find him guilty and give him the lowest penalty, which they have done. We are forbidden by the express terms of article 743 of our C. C. P. 1911 to reverse cases for matters in the charge unless we believe they have in some way injured the rights of the accused.

Being unable to bring ourselves to so believe in this case, the judgment will be affirmed.

### On Motion for Rehearing.

[3] Appellant again complains of the fact that the court repeated a part of his charge. The part referred to was in reference to the fact that penetration must have been established beyond a reasonable doubt before conviction, etc. We find nothing in that part of the charge so repeated which was calculated to weaken in any way a defensive theory, or that tended to lead the jury to give more weight or credence to any theory of the state, and we see no possibility of injury to the appellant by such repetition.

No special charges were asked presenting any theory of the case advanced by the appellant. As far as we can ascertain he had no theory save that he did not do what prosecutrix claimed he had done. The court below told the jury in the charge that if they had a reasonable doubt as to his guilt they should acquit him.

The charge of the court places an unnecessary burden on the state in that after telling the jury to convict if they believed beyond a reasonable doubt that he had carnal knowledge of the prosecutrix, the court further told them, in substance, that they could only convict if they believed beyond a reasonable doubt that prosecutrix was a woman and that the assault was by force and without the consent of said prosecutrix. As stated in our original opinion, there was no dispute of the fact that the girl was under the age of consent. These matters are touched on in the opinion in Dyer v. State (Tex. Cr. App.) 283 S. W. 820. We see no ground for complaint on the part of appellant. These are the matters set up in appellant's motion for rehearing, and, being unable to agree with any of them, said motion will be overruled.

---

## CAMP OIL & GAS CO. v. ROBERTSON.* (No. 2674.)

(Court of Civil Appeals of Texas. Amarillo. May 26, 1926. Rehearing Denied Oct. 6, 1926.)

Assignments ⊂⇒73—Under letter directing bank to pay to oil company money held by it under writer's directions, money received by bank from proceeds of oil runs from lease after April 29, 1924, held not under writer's direction, in view of his assignment to another oil company.

Under letter instructing bank to pay to oil company money in bank and held by it under writer's directions, money received by bank from proceeds of oil runs from lease after April 29, 1924, held not under writer's direction where he had assigned to another oil company his interest in such lease, providing in assignment that delivery of interest conveyed should be made as of such date.

Hall, C. J., dissenting.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Suit by the Prairie Oil & Gas Company against the First National Bank of Wichita Falls, the Camp Oil & Gas Company, Ross R.

---

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused November 24, 1926.

Robertson, and another, in which the last-named defendant filed a cross-action against the second-named defendant. Judgment for plaintiff against the last-named defendant and other defendant, and for the last-named defendant against the second-named defendant, which appeals. Affirmed.

Kenley, Dawson & Holliday, of Wichita Falls, and Wm. Boyce, of Amarillo, for appellant.

Kay, Akin & Smedley, of Wichita Falls, for appellee.

RANDOLPH, J. The following part statement of this case is taken from the written statement and argument made by appellant:

"This suit was brought to recover the amount of a special escrow deposit, alleged to have been wrongfully paid by the depository holder, the First National Bank of Wichita Falls, to the Camp Oil & Gas Company, hereinafter called the Camp Company. The suit was brought by the Prairie Oil & Gas Company against the First National Bank, the Camp Oil & Gas Company, Ross R. Robertson, and a surety company, signer of a surety bond given by Ross R. Robertson to the Prairie Company. Robertson by cross-action sought recovery over against the Camp Company in the event judgment was against him. Trial before the court without a jury resulted in judgment for the Prairie Company against Robertson and the surety company, and in favor of Robertson over against the Camp Company. The Camp Company alone appeals, and the appeal involves questions of the right of the appellant and the appellee Robertson, growing out of a settlement contract between said parties hereinafter mentioned.
\* \* \*

"Prior to the making of the said contract which furnishes the immediate occasion for this suit, Robertson and the Camp Company owned undivided interests in certain oil and gas leases, known as leases C and G. The Camp Company had the exclusive right by contract to develop and operate these leases and to make expenditures for drilling wells, purchasing machinery, etc., 'each party being liable for a pro rata part of the expenses.' This agreement provided: That the oil runs from such leases should be deposited in the First National Bank for the protection of the Camp Company 'against liability incurred on account of the interests of the other parties.' That the Camp Company should have the right to use such funds in the development and operation of the leases. 'That if the proceeds of oil should be more than sufficient to discharge obligations incurred for the next preceding month, the bank should disburse the balance to the parties in accordance with their several interests, but in this connection it is agreed that $5,000 shall be at all times retained by said bank for the purpose of taking care of current emergency expenditures.'

"On January 22, 1924, Robertson not being satisfied with the charges made by the Camp Company on account of development and operation, gave the bank written notice not to allow the Camp Company to withdraw his interest deposits theretofore or thereafter made. The controversy remained unsettled until the settlement agreement of October 24, 1924, hereinafter mentioned. The proceeds of the oil runs after January 22, on account of Robertson's interest in said leases were in the meantime held in the bank. On October 24, 1924, there was on deposit to Robertson's said interest on account of oil runs, the total sum of $2,535.32. Of this amount $2,199.66 was credited to lease G and $336.26 to lease C. The Camp Company at such time claimed that Robertson owed it as his part of expenses of development and operation of said leases, the total sum of $5,661.15.

"On October 24, 1924, a settlement agreement was made between the Camp Company and Robertson. This was evidenced partly, if not wholly, by writing. The writing consisted of, first, an assignment by Robertson to the Camp Company of his interest in lease C. This assignment provided that said Camp Oil & Gas Company releases the grantor of all debts or claims that it has against said grantor accruing out of the operation and development of what is known as the Camp Oil & Gas Company's G and C leases. At the same time and as a part of this transaction Robertson signed and delivered to the Camp Company a letter addressed to the First National Bank, reading as follows: 'Having sold all my interest in lot 1, block 27, of the American Tribune New Colony Company (which was lease C) to the Camp Oil & Gas Company, a trust estate, of Tarrant county, Tex., I have no further interest in the money held by your bank under my direction. I, therefore now direct that you release said money to the Camp Oil & Gas Company on the Camp Company leases G and C.'

"On the day of delivery of this letter, the Camp Company presented it to the First National Bank, and said bank paid to it the said sum of money to the credit of said two leases, to wit, the total sum of $2,535.32."

The negotiations attending and preceding the execution of the two last instruments are, in our opinion, unimportant. It is probable that they are admissible as explanatory of the intention of the parties in the writing of the letter. It was agreed between A. L. Camp and De Montel, who represented Robertson in the settlement, that the Camp Company was to pay Robertson for his interest in lease C $7,000 cash, and was to release all claims it held against Robertson on account of development and operation of leases C and G. Robertson on his part agreed that the Camp Company might withdraw the sums of money to the credit of his interest in the oil runs from leases C and G on deposit in the First National Bank. It is claimed by De Montel that Camp made the final proposition to pay Robertson the $7,000 and to release all claims and that Robertson was to turn over the money on deposit in the bank to the credit of his interest in leases C and G, and that Camp represented that such deposit amounted to $300 or $400, that he did not know how much money was in the bank to the credit of Robertson's interest in the two leases, but that he relied on the statement of Camp, and would not have made the trade had he known the actual amount. This was denied by Camp, who testified that he figured up the amount with De Montel, and that De Montel knew the exact amount that

was in the bank to the credit of Robertson on both leases.

The appellant contends that the judgment of the trial court cannot be sustained on the conclusion that the contract as actually made limited the right of the Camp Company to receive from the bank only a part of the money to the credit of lease G. Independent of the testimony of De Montel as to the representations made by Camp, the written order to the bank contained a limitation upon the money to be received thereunder. Appellant insists that the letter or order is in plain and unambiguous terms. We agree that this is true. The letter bearing date October 24, 1924, instructs the bank to pay to the Camp Company the money in the bank and held by it *under Robertson's directions.* Therefore all money coming under this designation was rightfully paid by the bank to the Camp Company.

Was the money received by the bank from proceeds of the oil runs from lease G after April 29, 1924, under the direction of Robertson? On the 30th day of July, 1924, Robertson had duly assigned to the Prairie Oil & Gas Company his interest in lease G and had provided in the assignment that the delivery of the interest conveyed should be made as of April 29, 1924. It was provided for Robertson to discharge all claims or liens against said interest up to said time and to account to the Prairie Oil & Gas Company for all revenue or income since said date. The Prairie Oil Company, knowing that the Camp Company was in a dispute with Robertson over its account against him, required a surety bond from him. The Camp Company knew about Robertson's transfer of his interest in lease G to the Prairie Company, and was fully informed as to the details. At the time of the sale by Robertson to the Prairie Company, the oil runs to the credit of lease G. Robertson's interest amounted to the sum of $2,199.06; of this amount $2,002.43 was for oil runs from said lease G after April 29, 1924. This would leave in the fund from lease G, subject to Robertson's directions, $196.63. Accepting the language of the letter and contract as being plain and unambiguous, the result is that such letter of directions to the bank, ordered it to pay to the Camp Company the sum of $196.63 from the oil runs from lease G, and such sums as were on deposit to the credit of lease C, which were subject to Robertson's directions. This being true, the wording of the letter and contract sustains the judgment of the trial court.

Appellant also urges error on the part of the trial court in the rendition of the judgment as one of damages for deceit, for the reason that there is neither pleading nor proof of facts necessary to sustain the amount recoverable, and, in support of this contention, cite George v. Hesse, 100 Tex. 44, 93 S. W. 107, 8 L. R. A. (N. S.) 804, 123 Am. St. Rep.

772, 15 Ann. Cas. 456, and Moore v. Beakley (Tex. Com. App.) 215 S. W. 957, laying especial stress upon the George Case. That case was a suit for damages arising out of an exchange of property, and was an action for deceit in that George was charged with having represented to Hesse, and caused him to believe and act in consummating the trade, upon the fact that Hesse's land had a gusher of water upon it, which representation was material and proved to be false. The Supreme Court, in stating the measure of damages under these facts, say:

"This is not a case in which the plaintiff sues for the breach of a contract, for the contract has been performed by both parties. But it is a case in which the plaintiff sues to recover damages for a fraudulent representation by which he has been induced to enter into a contract to his loss. Clearly, we think, the extent of his loss is the difference between the value of that which he has parted with, and the value of that which he has received under the agreement. The contract in this case was not to convey a tract of land * * * which was falsely represented to have a 'gusher' on it, which false representation was an inducement which led to the contract. Logically, therefore, what he has lost by the transaction is the measure of his damages. Let us suppose that when the fraud was discovered, George had not conveyed any of the property transferred to him, and Hesse had sued for a rescission as he would have had the right to do; the parties would simply have been placed in statu quo, and the plaintiff would have recovered nothing for his failure to get the property as represented. He would have recovered his property, and there would have been no loss, except the expenses of the litigation. So in this case, if the plaintiff recovers a sufficient sum in money to make that which he has received equal to that which he has conveyed, and that which he has assumed to pay, he is compensated for his loss, as we think, that is the measure of his damages."

It will clearly be seen that such is not the case at bar. The suit here is to recover a sum of money charged to have been wrongfully appropriated by the defendant Camp Company. The facts are fully pleaded, and show clearly that the question is as to whether or not said sum of money comes within the terms of the contract. If it does not, the plaintiff and Robertson were entitled, at all events, to recover; if it does come within its terms, then the Camp Company was entitled to judgment that Robertson take nothing by his cross-action. The suit by the plaintiff and cross-action of defendant Robertson were in nowise attempts to rescind the contract, but expressly recognized such contract and seek to recover a specific fund which they claim belongs to the plaintiff by virtue of the various contracts. Hence it was not an action for deceit, but a suit in assumpsit. The contract in the case at bar was completed, but one party thereto claims to have been deprived of a certain sum which he alleged did not come within the terms of the con-

tract, and suit is for that sum; they desire the contract to stand, but are seeking to recover a sum misappropriated by the defendant Camp Company, under its claim that it was part of the consideration for such contract.

Giving defendant Robertson's cross-action every construction warranted by its language, the allegations of fraudulent representations are simply explanatory of the actual contract entered into, not for the purpose of avoiding it. Even if it is true that the fraud alleged resulted in a contract which had been performed, the performance of same does not preclude a person from suing for damages, or to recover sums which have wrongfully come into the other party's hands under claim that such were a part of the consideration stated in the contract. Grabenheimer v. Blum, 63 Tex. 374. However, this is not a suit for damages but is one in as sumpsit for money had and received, this notwithstanding the allegations of fraudulent misrepresentations.

Where plaintiff in writing contracted with defendant to exchange a stock of goods for a farm and to assume an incumbrance thereon and the incumbrance was larger than specified in the contract, and, the contract being otherwise fully executed, assumpsit would lie against the defendant for the excess plaintiff was obliged to pay over the stipulated amount in order to satisfy the incumbrance. Wilson v. Wilson, 106 Mo. App. 501, 80 S. W. 711.

And where a stipulated sum is due on special contract, where the contract had been fully performed and nothing remained to be done but the payment of the agreed price, a suit in assumpsit will lie. Thompson-Houston Elec. Co. v. Berg, 10 Tex. Civ. App. 200, 30 S. W. 454.

Where one person has received money of another which in honesty and good conscience he cannot retain, an action will lie for money had and received. Merryfield v. Wilson, 14 Tex. 224, 225, 65 Am. Dec. 117. We therefore hold that the trial court did not err in the measure of damages fixed.

Appellant's proposition that the trial court erred in basing his judgment upon testimony that the defendant introduced as to the alleged false representations of Camp to De Montel, because same varies the terms of the written contract and such testimony will not sustain the judgment, is overruled, for the reasons: (1) That the terms of the written contract in plain and unambiguous language limits the amount which the bank was to pay to the Camp Company, to such sums credited to lease G, which was under the directions of Robertson, and such testimony thereby became immaterial; (2) the amount subject to the order is clearly shown to have been the sum of $196.63, and could not include the oil runs after April 29, 1924.

In our view, the finding and conclusion of

286 S.W.—63

the trial court upon such evidence was immaterial, in view of the written contract and other evidence in the case.

The question of the Camp Company's right to appropriate the fund derived from the proceeds of the oil runs in lease G after April 29, 1924, because of any lien claimed by it, is not before this court. In its pleadings the Camp Company claimed the ownership of the fund by virtue of the settlement with Robertson, and, in the event it failed in this claim, then that it have judgment over against Robertson·because such sums were due it for the expenses of the development and operation from Robertson, which had been agreed on and was a stated account. The evidence is conflicting on this question, and we will not disturb the finding and judgment of the court. Again, if the Camp Company had a lien upon such funds, that did not justify its appropriation of the fund.

We have considered all of the propositions and assignments of appellant, and, finding no reversible error, we affirm the trial court's judgment.

JACKSON, J. (concurring). The contract by which Ross R. Robertson, the appellee, sold and conveyed lease C to the Camp Oil & Gas Company, the appellant, provides:

"It is understood and agreed that this assignment is to take effect as of September 30, 1924, and said Camp Oil & Gas Company releases the grantor of all debts or claims that it has against the said grantor accruing out of the operation and development on what is known as the Camp Oil & Gas Company's G and C leases in Archer county, Tex."

The consideration passing to appellant in this transaction was the interest of the appellee in lease C, the payment of the debts and claims of appellant against appellee, and the money held in the First National Bank of Wichita Falls, Tex., by the direction of appellee.

The letter directed to the First National Bank, signed by appellee and delivered to appellant, which is a part of the contract, omitting the address, reads:

"Having sold all of my interest in lot 1 in block 27 of the American Tribune New Colony Company to the Camp Oil & Gas Company, a trust estate of Tarrant county, Tex., I have no further interest in the money now being held by your bank under my direction. I therefore now direct that you release said money to the Camp Oil & Gas Company on the Camp Oil & Gas Company's leases G and C."

This letter is not ambiguous, but in plain terms advises the bank that appellee has no further interest in the money held in the bank under his direction, and directs the bank that such money be released to the appellant. The court finds:

"At the time Robertson wrote the letter of October 24, 1924, to the First National Bank of Wichita Falls, Tex., and delivered it to A. L.

Camp, the above-described sum of $2,002.43 had been assigned and transferred, together with the leasehold interest to the Prairie Oil & Gas Company, and belonged to the Prairie Oil & Gas Company, and Robertson was no longer interested in said sum of money, and it was not then being held in the First National Bank under Robertson's direction. A. L. Camp knew of the terms of the assignment from Robertson to the Prairie Oil & Gas Company, and that under that assignment the Prairie Oil & Gas Company was entitled to the possession of oil runs from what had been Robertson's interest in said lease G subsequent to April 29, 1924."

It is uncontroverted that the Prairie Oil & Gas Company had purchased from appellee his interest in lease G, and his interest in the funds accumulated in the bank from said lease after April 29, 1924, subject to appellant's legitimate claim against appellee for expenses incurred in operating the lease; that appellant notified the Prairie Oil & Gas Company of its claim; that the Prairie Oil & Gas Company notified the bank of its purchase of the interest of appellee, and that it owned the money belonging to his interest and would hold the bank responsible for the proper disbursement thereof, and denied the right of the appellant to the proceeds of any oil runs made after April 29th. The appellant was fully advised of the terms, conditions, and details of the transaction between appellee and the Prairie Oil & Gas Company, and of the notice given by said company to the bank with reference to the funds held therein.

Mr. Robertson testified that, when he sold to the Prairie Oil & Gas Company lease G, he and a representative of the company went to the bank and told its officers that the money that came in after April 29th was to be credited to the Prairie Oil & Gas Company, that the bank requested that he write a letter to that effect, and that he did so, after which he asserted no claim to the proceeds of said oil runs on lease G.

It is my opinion that the finding of the court to the effect that on October 24, 1924, the date of the letter of appellee to the bank, and of the payment by the bank to appellant of the money in controversy, appellee was no longer interested in said money and it was not held in the bank under his direction, is sustained by sufficient testimony.

On October 24th there was on deposit in the bank $2,002.43 accumulated from the oil runs on lease G after April 29, 1924, which unquestionably belonged to the Prairie Oil & Gas Company, subject to appellant's claim for its debt against appellee, and which the bank had been by the Prairie Oil & Gas Company forbidden to pay to appellant.

The record is uncontroverted that in August, 1924, the Prairie Oil & Gas Company purchased from appellant its interest in lease G, at which time it was discovered that appellant had withdrawn from the First National Bank approximately $800 of the

money paid into the bank from oil runs from said lease G subsequent to April 29th, which amount had been credited to the interest formerly owned by appellee; and the appellant redeposited in the bank said sum, and agreed with the Prairie Oil & Gas Company that the deposit should remain in the bank until the controversy between appellant and appellee should be settled.

The court found that by negotiations between appellant and appellee an agreement of settlement was reached on October 24, 1924. It is conceded that appellant was fully advised of the different items on deposit in the First National Bank at the time it made the settlement with appellee. Appellant's contention, however, is that the item of $2,002.-43 was held in the bank by the direction of appellee, and, under the authority contained in the letter addressed to the bank by appellee, it collected said sum and was entitled thereto.

Under the findings of fact by the trial court, which, in my opinion, finds sufficient support in the testimony, this money was not held in the bank at the date of the letter by the direction of appellee; hence appellant was not entitled to collect said sum, because the letter on which it acted limited the money which should be released to the money then held in the bank under appellee's direction.

Appellant did not plead mistake, nor ask for a cancellation of, nor a reformation of, the contract of sale and settlement between it and appellee, but sought to enforce the contract and settlement as made. When this settlement was made, appellant's claim and lien on the money in the bank was released, and it was entitled only to the amount held under appellee's direction, and this did not include the item in controversy.

I conclude the judgment should be affirmed.

HALL, C. J. (dissenting). Prior to January 22, 1924, Camp Oil & Gas Company, an unincorporated association, Ross R. Robertson, and other parties owned certain oil leases in Archer county, among them being two leases, designated in the record as lease G and lease C. Under contract between the owners, the Camp Oil & Gas Company, hereinafter called the Camps, were developing and operating the leases. This contract provided, generally, that the Camps had the exclusive right to develop and operate said leases, to make all expenditures necessary in drilling wells, etc., and that each party should be liable, pro rata for such expenses; that the oil runs from such leases should be deposited in the First National Bank of Wichita Falls for the protection of the Camps against liability incurred on account of the interest of the other parties, and that the Camps should have the right to use such funds in developing and operating the leases; that, if the proceeds from oil runs for one

month should be more than sufficient to discharge obligations for the preceding month, the bank should distribute the balance amongst the owners ratably; but that as much as· $5,000 should be at all times retained by said bank for the purpose of taking care of the current and emergency expenditures. After the leases had been operated for some time and the proceeds deposited in the bank under said contract, Robertson became dissatisfied with the charges being made by the Camps, and objected to certain items of expense, and on January 2, 1924, gave the bank written notice not to permit the Camps to withdraw any part of his interest in the deposits· theretofore or thereafter made.· This order was obeyed by the bank.

On the 13th day of June, 1924, Robertson contracted to assign his interest in lease G to the Prairie Oil & Gas Company, which will hereinafter be designated as the Prairie. The consideration named in the assignment was $12,000 cash. The assignment contained this stipulation:

"The lease is to be made and possession given as of April 29, 1924, at 7 o'clock a. m. First party (Robertson) is to discharge all claim or liens against said interest up to said date, and is entitled to all the in-coming revenue therefrom prior to said date. Party of the second part (the Prairie) is to assume and pay all operating and developing costs and expenses chargeable against said interest subsequent to April 29, 1924, at 7 a. m., and is entitled to the revenue and income accruing to said interest since said date."

On the 31st day of July, 1924, Robertson made a written assignment of lease G to the Prairie, in which it is recited:

"It is hereby agreed that the delivery of the interest hereby conveyed shall be made as of April 29, 1924, at 8 o'clock a. m., and the undersigned agrees to discharge all claims or liens against said interest up to said time, and shall account to the Prairie Oil & Gas Company for all revenue or income since said date. On its part, said purchaser assumes all charges, costs, and expenses chargeable against said interest arising out of the operation and development of said leased premises since said date."

On the same· day, Robertson, as principal, and the Southern Surety Company, as surety, delivered to the Prairie his bond in the sum of $5,000, agreeing to save the Prairie and its assigns harmless from all loss, cost, charges, or expenses to be imposed on or demandable from it of any and every kind or character whatsoever. The bond recites:

"Whereas, the Camp Oil & Gas Company, a trust estate, is asserting some right, title, lien, or claim to the said five forty-eighths leasehold interest by virtue of said original and· supplemental contracts, and the above-bounden R. R. Robertson and the Southern Surety Company have agreed jointly and severally to have said claim or lien canceled of record."

This bond was required by the Prairie because the Camps, on June 25, 1924, had writ-

ten the Prairie, in substance, that if it purchased Robertson's interest in lease G, the Camps would not agree to any change in the running of Robertson's pro rata oil runs until he had paid all charges due from him to the Camps for operation and development upon said lease, and further notified the Prairie that, when it had consummated its purchase of Robertson's interest, and he had paid all such expenses and charges due them, the Camps would contract with the Prairie· to run all the oil from said lease and procure a release from the crude contract upon the same, "to become effective June 4, 1924, the date he tied into the tanks upon said lease." This letter has the following postscript: "The amount due us up to April 29, 1924, by the said Robertson, is, upon said lease, $2,392.53."

There is a stipulation in the record that from and after April 29, 1924, to June 4, 1924, oil was run from lease G to the interest owned by Robertson the sum of $2,102.43, which sums had been paid into the First National Bank of Wichita Falls.

On July 29, 1924, the Prairie notified the bank in writing that it had purchased Robertson's interest in lease G, effective April 29, 1924, at 7 o'clock a. m., and was claiming Robertson's interest in the proceeds of oil runs from said lease, then in the hands ·of the bank, and which was being held by the bank because of some disagreement between Robertson and the Camps. In this letter they notified the bank that the Prairie was claiming all of that fund deposited since April 29, 1924, and denied the right of the Camps to have said sum.

On October 24, 1924, the Camps claimed that Robertson owed as his part of the expenses of development and operation, the total sum of $5,661.15. On that date there was a credit to Robertson's interest on account of oil runs, then being held by the bank, the sum of $2,535.32. Of this amount $2,199.66 was credited to lease G, and $336.26 to lease C. On that date Robertson assigned to the Camps his interest in lease C, as part of a compromise and settlement agreement made by them.

It was stipulated therein that the assignment of lease C should take effect as of September 30, 1924. In addition to the $7,000 which the Camps paid Robertson for lease C, it was stipulated that the Camps released all debts and claims and expenses due them from Robertson for the operation and development of leases G and C. As a part of the compromise and settlement agreement, Robertson delivered to the Camps a letter dated the same day, addressed to the First National Bank, telling them that he had sold lease C to the Camps, and further says:

"I have no further interest in the money now being held by your bank under my direction. I therefore now direct that you release said mon-

ey to the Camp Oil & Gas Company on the Camp Oil & Gas Company leases G and C."

The next day Camp delivered this letter to the bank, and the deposit of $2,535.32 to the credit of said leases was paid to him.

On April 13, 1925, the Prairie filed this suit against Ross R. Robertson, the Camps, and the First National Bank, to recover the amount of the deposit in the bank to the credit of lease G after April 29, 1924, amounting to $2,002.43. The Prairie set up the facts in virtue of which it became the owner of lease G and of the funds sued for, and further alleging that on the 29th day of October, 1924, there was a settlement between Robertson and the Camps whereby the Camps' lien on the lease and fund was released, but that the bank had paid said sum to the Camps. It also sued the Southern Surety Company upon the indemnity bond.

Robertson answered that he was not liable upon the bond, since it was given only to secure his obtaining from the Camps a release of their lien, and was not intended to secure to the plaintiff the payment of the money in the bank. By cross-action against the Camps, he sought to recover the sum claimed by the plaintiff, and alleged that he had sold his interest in lease G on June 13, 1924, effective as of April 29, 1924; that at the time of said sale the Camps were claiming an indebtedness against him for operating expenses on lease G prior to April 29, 1924, and on lease C, but that there was a disagreement between the parties as to the amount of this indebtedness; that on October 24, 1924, he, acting by and through his attorney, E. C. De Montel, and the Camps, acting by and through the president of the association, A. L. Camp, entered into a settlement agreement, as follows:

(1) Robertson sold to the Camps his one-fifth interest in said C lease for $7,000.

(2) The Camps agreed to release all claims against Robertson for operating expenses on both leases G and C.

(3) That a sum of money then in the bank, of about $300, being the proceeds from Robertson's one-fifth interest in lease C then being sold, and also from what had been his interest in lease G prior to April 29, 1924, was released to the Camp Oil & Gas Company. He alleged that the exact amount of this fund was unknown to him or his attorney, but that Camp represented that the amount was $300 or $400, and that it was made up of the proceeds from leases C and G prior to April 29, 1924.

"That, in the course of the negotiations in which the settlement above described was made, the said A. L. Camp, acting as aforesaid for the Camp Oil & Gas Company, stated and represented to this defendant and to the said E. C. De Montel, that there was on deposit in the First National Bank of Wichita Falls, Tex., a sum of money amount-

ing to approximately $300, which was the proceeds from the oil runs from lease G prior to April 29, 1924, and proceeds from oil runs from lease C, and as a part of the said negotiations and settlement, it was agreed between the parties thereto that the bank might deliver and pay to the Camp Oil & Gas Company the said sums so on deposit with it, and which had been held by said bank as a credit to this defendant's interest in said leases, and, although the said A. L. Camp well knew that at that time there was on deposit in said bank the sum of $2,002.43, the proceeds credited to the five forty-eighths interest in said lease G for oil runs subject to April 29, 1924, and prior to July 31, 1924, and which was being held by said bank under the direction of the Prairie Oil & Gas Company. He wholly failed to advise this defendant or the said E. C. De Montel of that fact, but, on the contrary, as this defendant now believes, concealed that fact from them. This defendant, relying upon the aforesaid statements and representations of A. L. Camp, that there was on deposit in the said bank, as proceeds of said lease G and lease C, approximately $300, and, believing the same to be true, on October 24, 1924, wrote a letter to the First National Bank, and delivered it to the said A. L. Camp, advising said bank that he had no further interest in the money then being held in said bank under his direction, and authorized said bank to release the money to the said Camp Oil & Gas Company, on leases G and C, and through which letter the said A. L. Camp received from said bank the sum of $2,535.32, which sum included the oil runs from lease G prior to April 29, 1924, the proceeds from oil runs credited to lease C, and also the $2,002.43 representing proceeds of the oil runs from April 29, 1924, to July 31, 1924, credited to lease G."

He further alleges that the exact amount of this fund was unknown to him or his attorney, and prays that, if plaintiff recover a judgment against him for said sum, he have judgment over against the Camps for the same amount.

In reply to Robertson's cross-action, the Camps set up: The operating agreement between them and Robertson and other co-owners, which authorized them to use said funds and draw checks on the First National Bank for the purpose of paying expenses. That Robertson had not paid his pro rata part of the expenses of either of said leases at the time of the sale of his interest in lease G to the plaintiff, and that he owed the Camps on operating expenses much more than the amount on deposit in the bank credited to Robertson's interest in said leases. That because of said facts the Camps were the owners of said fund credited to Robertson's interest. That the Camps were in no wise privy to the sale by Robertson of his interest in lease G to the plaintiff, and that plaintiff took said lease subject to the

rights of the Camps under the operating contract. That prior to April 29, 1924, Robertson had notified the bank to withhold from the Camps all his interest in the proceeds from lease G, and prior to final settlement on October 24, 1924, gave the bank a similar notice with reference to lease C, and that the bank, in compliance with said notices, had withheld all such funds up to final settlement, all of which was well known to Robertson. That on the 24th day of October, 1924, the Camps purchased from Robertson his interest in lease C, effective as of September 30, 1924, for a consideration of $10,125.83 which was paid as follows: $7,000 cash, $5,561.51 by a cancellation of that amount due the Camps from Robertson for operating expenses on both of the leases, and the transfer to the Camps by Robertson of all the funds then on deposit in the bank credited to what had been Robertson's interest in leases G and C. That thereupon Robertson gave the Camps an order authorizing the bank to pay said funds to the Camps. That both Robertson and De Montel had full and correct information at the time of said settlement as to the amount of said funds in the bank, and that the said Camp did not conceal or misrepresent anything in the making of said compromise and settlement.

There was a trial before the court without a jury, and judgment was rendered for the plaintiff, the Prairie Company, against Robertson for $2,002.43, and in favor of Robertson over against the Camp Oil & Gas Company for a like amount. The Camps alone have appealed.

Robertson's action against the Camps, as shown by the quoted paragraph from his cross-action, is one for fraud and deceit. The findings of fact show that the court considered it as an action based upon fraud, and the evidence introduced shows that the case was tried upon that theory in the lower court. We are therefore bound to consider it as a case of fraud and deceit in so far as the appellants and the appellee are concerned.

I am unable to approve the finding of the honorable trial judge upon the issue of fraud. In the matter of the compromise and settlement, the Camps and Robertson dealt upon equal terms. No confidential relations existed between them. A. L. Camp, the active head and president of the Camps, had disagreed with Robertson upon the question of charges for expenses, which the Camps had made against Robertson's share of the income from the leases, and A. L. Camp and Robertson were not upon speaking terms. Because they were not friendly, De Montel was representing Robertson in the settlement of October 24, 1924. It appears that, from a minute and critical inspection of the expense accounts rendered to him from time to time by the Camps, Robertson had concluded that certain items charged to him were not proper, and, after refusing to allow them, he notified the bank not to permit the Camps to draw upon his share of the deposit for the payment of any part of the expense accounts. This notice was given in January, 1924, and this condition continued to exist for about 9 months prior to the settlement, during which time the Camps had continued to operate the lease and deposit Robertson's share of the gross income in the bank. They also rendered him monthly statements showing the condition of the account, and in some of the last statements Robertson's balance in the bank was written in red ink, showing that there was to his credit from lease G, $2,199.06, and from lease C, $336.26. I am unable to believe that the same business acumen and diligence manifested by Robertson which led him to detect the alleged errors in charges for expenses, did not also enable him to learn the amount to his credit upon the rendition of each account. Especially, am I not willing to believe that he contracted to sell lease G to the Prairie in June, and later consummated the deal in July, without both of said parties learning from the bank the state of that account as shown by the bank's books. I am confirmed in my views that Robertson and the Prairie both knew how much money there was to Robertson's credit in the bank from lease G by the fact that the Prairie required of Robertson an indemnity bond to secure the payment of that very fund. The bond is in the sum of $5,000. Why did they happen to make it about twice the amount of Robertson's credit if they had no information upon that point? Upon what basis did they estimate the sale value of Robertson's interest in the lease? Why was the sale consummated about the last of July made to relate back to April 29th, at 8 o'clock a. m., if the condition of the bank account concerning which they contracted was unknown to them? These, I think, are pertinent questions. Reasonable business men do not ordinarily invest $12,000 in a producing oil lease and date the sale back so as to cover previous oil runs then in a bank, without first knowing the amount to the credit of the lease, when such information is not only in the hands of one of the parties in the form of monthly statement, but the exact amount could be obtained in a moment by telephoning the bank.

All these considerations apply with much greater force in relation to the settlement contract between A. L. Camp and De Montel, as the agent of Robertson. The negotiations between Camp and De Montel continued over a period of two or three weeks before the deal was closed in October. If Robertson and De Montel had ground for believing that Camp was charging Robertson unfairly in the matter of expenses, this was a fact sufficient to arouse their suspicions and cause them to proceed cautiously in any further transaction with the Camps. Neither Robertson nor De

Montel deny the fact that they had received the monthly statements, but they seek to avoid the force of that evidence by saying that they were not auditors and could not understand the statements. If the statements were unintelligible, then, for a stronger reason they should have applied to the bank for definite information as to the amount of money on deposit there to Robertson's credit. Several of the original statements, however, are before us in the record, including the very one used by A. L. Camp and De Montel during their negotiations prior to the settlement. According to the testimony of A. L. Camp, his son, and Miss Hardwick, their bookkeeper and stenographer, this statement, with some yellow sheets of paper, are the identical ones used by Camp and De Montel in arriving at the terms and conditions of the settlement. De Montel denies that he ever saw the yellow sheets of paper, but the fact remains that the statement is plain and simple, containing two items which show the debits, oil runs, and balance from each lease, and, under these, two more items showing the oil runs, and balance from the same two leases then in escrow. The statement is so short, simple, and clear that a child can understand it. According to the language of the bond, it is clear that Robertson and the Prairie knew that the Camps were making certain claims for expenses, payable out of Robertson's interest in the fund, and it appears that the Camps notified the Prairie by letter prior to the time the sale from Robertson to the Prairie was consummated that Robertson was indebted to them up to April 29, 1924, in the sum of $2,392.53, for the lease they were buying. It seems to me incredible that neither Robertson nor the Prairie, in a deal involving $12,000 cash, made any effort to ascertain what was to the credit of the lease, which was being assigned, when such an item must necessarily have entered very largely into the matter of fixing the sale price. Robertson and A. L. Camp were unfriendly, and the confidential relation which might have existed between them as owners in common of the property, therefore, did not exist. As heretofore stated, Robertson suspected the Camps of unfairly and unjustly charging expenses to which they were not entitled, and this was enough to put Robertson upon his guard and to require him to investigate before closing the deal. Wortman v. Young (Tex. Com. App.) 235 S. W. 559. The law never presumes fraud; on the contrary, the presumption is against it, and he who alleges it must prove it, and in my opinion this burden has not been discharged in this case by Robertson. Wells Fargo & Co. v. Neiman-Marcus Co. (Tex. Civ. App.) 125 S. W. 614; Reed v. Holloway (Tex. Civ. App.) 127 S. W. 1189; Burchill v. Hermsmeyer (Tex. Civ. App.) 212 S. W. 767; Tatum v. Orange & N. W. Ry. Co. (Tex. Civ. App.) 198 S. W. 348.

By the terms of the agreement under which the funds were held in the bank, there was appropriated and set aside to the Camps so much of the money as was necessary to reimburse them for legitimate and proper expenditures by the Camps, shown to be $5,-680, chargeable against Robertson's interest in the fund. The Prairie bought with full knowledge of these facts, and acquired no greater right than Robertson had. Ketchum v. City of St. Louis, 101 U. S. 319, 25 L. Ed. 999. The burden therefore rested upon Robertson to show by a preponderance of the evidence that in the settlement agreement Camp had reassigned the fund to him. No effort was made to discharge this burden. The $2,002.43 was a part of the fund which the bank had been holding since January 22, 1924, under the directions of Robertson, and his letter to the bank released all his claim upon it, and, since the Prairie occupies no better position with reference to it than Robertson, the fact that De Montel did not intend to release it, and failed to communicate that intention to either the Camps or the bank, does not alter the rule.

Aside from these matters, I think the judgment should be reversed and the cause remanded, for the reason that Robertson, in his pleadings, laid no predicate for the recovery of damages, in that no measure was set up and no evidence introduced from which the court could properly determine the measure. This being a suit based upon fraud and deceit in matter of inducement, Robertson's right to recover is governed by the rule announced in George v. Hesse, 100 Tex. 44, 93 S. W. 107, 8 L. R. A. (N. S.) 804, 123 Am. St. Rep. 772, 15 Ann. Cas. 456. The instant case, like that case, is one in which recovery is sought for fraudulent representations in matters of inducement, and not a suit for a breach of a contract, because the contract has been performed by both parties. In the George Case the Supreme Court said:

"Clearly we think the extent of his loss is the difference between the value of that which he has parted with, and the value of that which he has received under the agreement. * * * Logically, therefore, what he has lost by the transaction is the measure of his damages."

In entering a judgment in this case, the trial judge applied the rule which permitted Robertson to measure his damages by subtracting what he received from what he would have received if the representations had been true.

De Montel testified that he did not take the $2,002.43 into consideration in negotiating with Camp; that he refused to consider the figures and estimate which Camp had given him, but required Camp to make a lump sum proposition and wipe out all indebtedness. While this testimony was contradicted flatly by the evidence of A. L. Camp and his son, the court adopted De Montel's version of the matter. Then how did

the trial court conclude that the amount for which he gave judgment was the difference between the value of what Robertson had paid him and the value of that which he had received under the agreement?

Whatever may have been said between the parties prior to the consummation of the compromise and settlement agreement, I think it is clear that the contract as finally agreed upon was that Camp should pay Robertson $7,000, surrender his claim for expenses amounting to over $5,600, and that Robertson should convey him lease C and withdraw his contention as to the items of expenditure, and authorize the bank to pay all the money which had been held under his directions to Camp. This is the contract as actually executed and acquiesced in by the parties until the filing of this suit some months later. If the contention on the part of Robertson and De Montel, that they did not know the amount of the money in the bank, is entertained, then the minds of the parties did not meet, and there has been no contract of settlement, and the suit should have been one for rescission and cancellation, instead of an action for damages, based upon fraud and deceit.

For the reasons indicated, I think the judgment should be reversed and the cause remanded.